IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 6, 2018 Session

## INNERIMAGES, INC. v. ROBERT NEWMAN ET AL.

Appeal from the Circuit Court for Sevier County
No. 15-410-I          Carter Scott Moore, Judge

_____

### No. E2018-00375-COA-R3-CV
_____

Innerimages, Inc. ("Innerimages" or "the developer") filed suit against homeowners Robert Newman, David and Melba White,[1] and David and Susan Schilt as trustees for the David Schilt and Susan Schilt Trust. It sought to recover unpaid maintenance fees required by the restrictive covenants governing their real property. The homeowners filed a counterclaim, seeking various forms of relief. The homeowners also joined the following third-party defendants: Sandra Gunn, the president of Innerimages, homeowners David and Joan Barrett, and property owner Cupid's Rose, LLC.[2] After a bench trial, the court dismissed the collection action filed by the developer. The court determined: (1) that the restrictive covenants are unenforceable as to the four homeowners and their successors in title; (2) that the developer is liable for breach of fiduciary duty for its failure to honor its obligations under the restrictive covenants; and (3) that Sandra Gunn is personally liable under an alter ego theory of piercing the corporate veil. Finally, the court awarded the homeowners damages in the amount of all fees paid since taking ownership of their property or, in the case of the Schilt family, fees paid over the last three years. In a subsequent order, the trial court clarified that only Mr. Newman was entitled to money damages because the other homeowners had not paid fees to the developer during the relevant time period. The court also denied the homeowners' request for attorney's fees. Innerimages, Sandra Gunn, and Cupid's Rose, LLC appeal. Because this appeal presents novel issues relating to the enforceability of restrictive covenants, we take this opportunity to adopt the Restatement (Third) of Property: Servitudes § 6.19(1)-(2) (Am. Law Inst. 2000). We modify the trial court's judgment pursuant to the principles set forth in the Restatement. As modified, we affirm the judgment of the trial court.

---

[1] The Whites were married during the course of this litigation. Consequently, the trial court and the parties sometimes refer to Mrs. White by her maiden name "Nelson."

[2] Ms. Gunn testified that Cupid's Rose, LLC is an entity composed of Innerimages and a third party, "Global International."

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed as Modified; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II,, JJ., joined.

Heather G. Anderson, Knoxville, Tennessee, and Melanie E. Davis, Maryville, Tennessee, for the appellants, Innerimages, Inc., Sandra Gunn, and Cupid's Rose, LLC.

Brian T. Mansfield, Sevierville, Tennessee, for the appellees, Robert Newman, David White, Melba Marie Nelson, David Schilt, Susan Schilt, The David Schilt and Susan Schilt Trust, U/T/D, and Daniel Montgomery.

## OPINION

### I.

Innerimages is a Tennessee corporation. It develops real property in Sevier County.[3] It also performs design services for a prominent defense contractor in Maryland. Sandra Gunn is the president and sole shareholder of Innerimages. Ms. Gunn owns a home in Sevierville. At various times, she also resides in Maryland.

In September 1993, Innerimages acquired approximately fifteen acres of undeveloped real property located in the "Shagbark" neighborhood in Sevierville. Shagbark is a gated community that contains approximately 300 homes and 550 property owners. It provides twenty-four hour security with a guard at its entrance gate. Residents of Shagbark have access to amenities, such as a pool, tennis courts, an office building, and a picnic area. Residents are members of the Shagbark Property Owners Association (POA) and pay dues for maintenance of the amenities described above. Residents must also abide by the Shagbark Declaration of Restrictions (Shagbark Restrictions).

In October 1993, Innerimages recorded an instrument titled "Land Use Restrictions, Protective Covenants and Building Standards for The Village" (The Village Restrictions). This document declared the developer's intent to use its recently acquired property in Shagbarks to establish "The Village" – a small residential community *within* the larger Shagbark property.[4] According to The Village Restrictions, property owners in

---

[3] The following facts are undisputed unless otherwise noted.

[4] The Village Restrictions incorrectly state that The Cloisters in Shagbark, Inc. still owned much of the land that would become The Village. Evidence in the record suggests that The Cloisters in

The Village remain residents of Shagbark. Consequently, property owners in The Village must continue to abide by the Shagbark Restrictions and must also pay fees to the Shagbark POA.

The Village Restrictions impose additional restrictive covenants governing the use and appearance of property in The Village. In some ways, these restrictive covenants are more stringent than the Shagbark Restrictions. The Village Restrictions also require property owners to pay a monthly maintenance fee to the developer – forty dollars per month for an unimproved vacant lot and eighty dollars per month for an improved lot. According to The Village Restrictions, these fees

> shall be used by The Developer for: the maintenance of THE VILLAGE roadways; the overall security of the development; the maintenance of the utility plants, security entrance features and landscaping; the Shagbark [POA] maintenance fees and assessments when appropriate; and for such other purposes as The Developer or Association pursuant to its by-laws, deem necessary for property maintenance of services. It is anticipated that private recreational facilities will be constructed within THE VILLAGE. Said monthly fees will increase for improved lots in order to defer operational costs, maintenance, insurance and utilities at the time that these recreational facilities are constructed and in use for THE VILLAGE owners and guests.

(Capitalization in original.)

Finally, The Village Restrictions provide that until seventy-five percent of the lots in The Village have been sold, "[t]he [d]eveloper shall exercise all rights herein." When this occurs, "[a]ll owners of property shall automatically become members of The Village Property Owners Association," and the association will exercise the rights and responsibilities formerly exercised by the developer.

In 1996, the developer recorded two plats that identified how The Village would be subdivided. Together, the plats depicted eighty-six lots,[5] several recreation areas, and

---

Shagbark, Inc. conveyed its interest in the land to Innerimages approximately one month prior to the recordation of The Village Restrictions. That quitclaim deed was later recorded in December 1993.

[5] The trial court found that The Village initially contained eighty-four lots. However, testimony at trial revealed that Innerimages *purchased* eighty-four lots from The Cloisters in Shagbark, Inc. and that Innerimages already owned two lots. That would make a total of eighty-six lots. Our review of the recorded plats confirms this calculation.

a network of private roads. The property would be developed in five phases (Phases A – E). One of the plats showed an "Inn of the Clouds Conference Center" and a "Conference Center & Executive Suites" adjacent to The Village. At some point, the developer combined various lots, which reduced the total number of lots to eighty-two.

Since 1993, the developer has only sold six lots in Phase A of The Village.[6] Four of those lots are improved with homes. One lot, owned by the White family, is used as a septic drain field. The other lot, which is owned by Cupid's Rose, LLC, remained unimproved at the time of trial. Development of Phase B began on the eve of trial. The remainder of the property is unimproved. No property owners association has ever been formed.

David and Susan Schilt purchased their home on Lot 25/12B in March 2007.[7] At the time, the Schilts lived in Florida. They used their home in The Village as a vacation home and went there about four times a year. In 2012, the Schilts conveyed their home by quitclaim deed to the David Schilt and Susan Schilt Trust. In 2014, they moved from Florida to Seymour and began using their home in The Village about once a month. From 2007 to 2014, the Schilts paid monthly maintenance fees to the developer. They stopped paying the fees in 2015.

David and Joan Barrett bought their home on Lot 6A in August 2011. Their permanent residence is in Baxter. When they still owned their home in The Village, they used it about once a month. The Barretts always paid maintenance fees to the developer and did not wish to be parties to this litigation; however, they were subsequently joined as necessary and indispensable parties. After trial, the Barretts sold their home to Daniel Montgomery, who was substituted for the Barretts as an appellee. For convenience sake, we will continue to refer to this property as the Barretts' home.

Robert Newman purchased his home on Lot 1A in November 2013. He and his wife reside in The Village for about six months of the year. The Newmans also have a home in Louisiana. Mr. Newman paid maintenance fees to the developer in 2014. He stopped paying maintenance fees in 2015.

David and Melba White purchased their home on Lot 26/12B in April 2014. Because the Whites' septic tank was tied to a drain field on Lot 3A, the Whites also purchased Lot 3A. The Whites are permanent residents in The Village. They have never paid maintenance fees to the developer.

---

[6] In 1999, the developer also sold eleven lots in Phase C to a third party. The developer lifted the restrictive covenants as to those lots because the third party did not want to be associated with The Village.

[7] Although the Schilts' lot is designated "Lot 25/12B," all parties testified that the Schilts' lot is located in Phase A, not Phase B. The same is true for the White lot, which is designated "Lot 26/12B."

This litigation began in February 2015 when the developer filed three sworn accounts against Mr. Newman, the Whites, and the Schilts in the General Sessions Court for Sevier County, seeking the collection of unpaid maintenance fees. According to the developer, Mr. Newman and the Schilts both owed $650 plus interest, attorney's fees, and costs. The Whites allegedly owed $1,125 plus interest, attorney's fees, and costs. Each of the three families filed an answer and counterclaim.

By agreed order, the general sessions court consolidated the three cases and transferred them to the trial court. The trial court ordered the joinder of necessary and indispensable parties. Thereafter, the defendant homeowners filed an amended counterclaim and third party complaint, naming the following third-party defendants: Sandra Gunn, the president of Innerimages, homeowners David and Joan Barrett, and property owner Cupid's Rose, LLC.

The homeowners sought the following forms of relief: an order declaring The Village Restrictions to be unenforceable; an order compelling the developer to account for all funds allegedly spent on common expenses; a money judgment equal to the amount of any misappropriated funds; punitive damages for willful or intentional misconduct in the misappropriation or misuse of funds, breach of fiduciary duty, and conflict of interest; an order enjoining the developer from further interference with the homeowners' use of their property; and an award of attorney's fees and costs. The homeowners also alleged that Ms. Gunn should be held personally liable under an alter ego theory of piercing the corporate veil. In response, the developer filed a motion for summary judgment, which the trial court denied.

A four-day bench trial followed.[8] The parties stipulated as to the amount of fees that each homeowner allegedly owed. All homeowners, except Mr. Newman, also stipulated that The Village Restrictions were in their respective chains of title. The developer called the following witnesses: Ms. Gunn (the president of Innerimages), Stephen Gunn (Ms. Gunn's ex-husband and the vice-president of Innerimages), Janie Click (a lawn care and maintenance worker), Dan Hager (a board member of the Shagbark POA), Mark Gaisser (security chief and facility manager for Shagbark POA), and Rick Bearfield (an attorney qualified as an expert in title searches). The homeowners called: Mr. Barrett, Ms. Schilt, Mr. Newman, Mr. White, Michael Atchley (an employee of the Tennessee Department of Environment and Conservation (TDEC)), Daniel Ferguson (an environmental specialist for Sevier County Environmental Health Department), and James Temple (former assistant director of the Sevier County Planning Department). Witnesses testified about the relationship between Shagbark and The

---

[8] The Honorable Ben W. Hooper II presided. After the court entered its memorandum opinion, Judge Hooper retired from the bench. The case was then assigned to the Honorable Carter Scott Moore. Judge Moore entered the final order from which this appeal was taken.

Village, the enforcement of The Village Restrictions, the services provided (or not provided) by the developer, the developer's lack of accounting, etc. From this testimony, two radically different stories emerged.

According to the appellants, the developer has always intended to use its property to establish a residential community. Ms. Gunn testified about her plans to use The Village to support "Leslie's Week," a non-profit organization founded by Ms. Gunn that gives breast cancer patients and their families a one-week paid vacation. According to Ms. Gunn, the developer will eventually build a "spa" in Phase B of The Village and women will be able to rent certain homes in The Village for one week per year.

Ms. Gunn testified that development of The Village has been delayed due to "downturns in the economy," low appraisals, and federal laws that have restricted lending policies. Nevertheless, Ms. Gunn claimed that the developer has invested significant amounts of time and money into the project. According to her, the developer has: graded roads, recorded plats, paid for engineering and surveying services, applied for various permits from regulatory agencies, and installed underground utilities (conduits for electric, telephone, and cable as well as pipes for water and sewer collection). Mr. Gunn, the "project manager" of The Village, testified that the developer spent "close to sixty thousand dollars" on an experimental "Anflow system" that was designed to treat sewage for about sixty homes.[9] Although the Anflow system was never operational,[10] Ms. Gunn testified that it will eventually be modified to operate as a drip system. Ms. Gunn also testified that the developer continues to maintain roads in The Village and pays lawn care workers to weed-eat along the edges of roads, clear debris from ditches and culverts, and mow a drain field that services the septic systems of two homeowners in The Village. Ms. Gunn also testified that she has consistently enforced the architectural review restrictions.

According to the homeowners, The Village is virtually non-existent. The homeowners testified that the developer has only constructed four homes in twenty-four years, the last of which was built in 2007. The community's one paved road – Village Summit Drive – was actually paved pursuant to a private agreement between the homeowners and the developer; costs were shared equally. Although the developer and all residents in The Village have an easement to use the road, the homeowners insist that it rests entirely on their private property. There is also a gravel road leading to the

---

[9] The Anflow system consists of two 3,900-gallon tanks with a pumping chamber and a reactor where bacteria digest the effluent. The Anflow system was designed so that the effluent, once treated, would be discharged into a wetland and would then flow to a chlorination station, to a holding pond, and finally to a large lake.

[10] The proof showed that during the testing phase, the Anflow system was connected to a couple of homes not associated with The Village. Appellants concede, however, that the Anflow system never treated effluent from any homes in The Village.

Barretts' home. There was an unresolved factual dispute regarding the extent to which the developer maintained these roads.

The Barretts' home and the Newmans' home have traditional septic tank systems that tie into a common drain field allegedly maintained by the developer. The Schilts' home has a traditional septic tank system that ties into a drain field that the Schilts own and privately maintain. The Whites' septic system is a low pressure piping system that ties into a drain field on Lot 3A, which the Whites own and privately maintain.

Although the developer installed underground utilities (conduits and piping), the homeowners testified that the developer does not provide water. Instead, all four homeowners receive water from a well that is located on the Whites' property. The homeowners entered into a private well agreement that governs their use of the well.

In 2008, the Schilts demanded an accounting from the developer. Other homeowners demanded an accounting in October 2014. Although Ms. Gunn testified that the developer kept records of all expenses, she did not produce a complete accounting until litigation was underway. At trial, Ms. Gunn testified that, until shortly before trial, she deposited the homeowners' maintenance fees into the developer's operating account, which was used to pay expenses incurred by both The Village and Innerimages. Ms. Gunn insisted, however, that she kept track of how the maintenance fees were being spent. The homeowners argued that many of the "expenses" listed in the accounting were not "common expenses." The homeowners also alleged that Ms. Gunn comingled funds. Finally, the homeowners testified about Ms. Gunn's enforcement of the architectural review restrictions. All of the homeowners recounted stories of Ms. Gunn's strict interpretation and/or arbitrary application of the restrictions. This became a severe source of distress for the Schilt, Newman, and White families.[11]

After trial, the court produced a forty-page memorandum opinion. Findings of fact and credibility determinations were scattered throughout the court's summary of the testimony and the court's subsequent legal analysis. Although the court did not resolve all factual disputes that arose from the parties' testimony, the court clearly determined that the developer "cannot and has not fulfilled her obligations to the landowners under [The Village Restrictions]." The court also found that the developer never intended to relinquish control of The Village to a homeowners association. Instead, the court found that Innerimages "is used as a business conduit or a place to divert assets to the detriment of creditors" and is "purely an instrument for the enrichment of Sandra Gunn."

Ultimately, the court ruled that The Village Restrictions appear in the

---

[11] Because this case involves the enforceability of The Village Restrictions as a whole rather than the enforceability or interpretation of individual restrictions, we will not summarize every alleged violation.

homeowners' respective chains of title and "run with the land." However, the court also determined: (1) that the restrictive covenants governing The Village are unenforceable as to the four homeowners and their successors in title; (2) that the developer is liable for breach of fiduciary duty for failing to honor its obligations under The Village Restrictions; and (3) that Sandra Gunn is subject to personal liability under an alter ego theory of piercing the corporate veil. Finally, the court awarded damages to the homeowners in the amount of all fees paid since taking ownership of their respective property or, in the case of the Schilt family, fees paid over the last three years. The court reserved the issue of attorney's fees as well as the calculation of the aforementioned money judgments.

On February 21, 2018, the trial court entered an order resolving the issues previously reserved. The order stated that only Mr. Newman was entitled to money damages because the other homeowners had not paid fees to the developer during the time period identified in the court's memorandum opinion. The trial court also denied the homeowners' request for attorney's fees. This order was certified as final pursuant to Tenn. R. Civ. P. 54. Innerimages, Sandra Gunn, and Cupid's Rose, LLC appealed.

## II.

We restate and consolidate the issues raised by the appellants as follows:

> Whether the trial court committed reversible error by admitting extrinsic evidence that was offered at trial for the purpose of impeaching Ms. Gunn's character for truthfulness?

> Whether the trial court erred in holding that The Village Restrictions are unenforceable as to the four homeowners.[12]

> Whether the trial court erred in determining that the developer owed and breached a fiduciary duty to the homeowners.

> Whether the trial court erred in piercing the corporate veil to hold Ms. Gunn personally liable for the developer's alleged breach of fiduciary duty.

The homeowners raise the additional issue of whether the trial court erred in denying their request for attorney's fees.

---

[12] As we see it, issues 1, 2, 3, 4, and 7 in appellants' brief all relate to the enforceability of The Village Restrictions.

**III.**

We begin by considering the potentially dispositive issue of whether the trial court committed reversible error when it admitted extrinsic evidence that was offered at trial for the purpose of impeaching Ms. Gunn's character for truthfulness. Questions regarding the admissibility of evidence are reviewed for abuse of discretion. *Shipley v. Williams*, 350 S.W.3d 527, 552 (Tenn. 2011). Even when a trial court abused its discretion, however, this Court will not reverse the judgment of the trial court "unless, considering the whole record, error involving a substantial right more probably than not affected the judgment . . . ." Tenn. R. App. P. 36(b).

Counsel for the homeowners apparently asked the trial court in a post-trial brief to admit into evidence an exhibit that was previously marked for identification purposes only.[13] The exhibit contained several court documents relating to a 1989 judgment of the U.S. District Court for the Eastern District of Tennessee that afforded full faith and credit to judgments entered in a Colorado state court in favor of First Federal Savings Bank and against Mr. Gunn and Caltennco-Colorado, Inc. In that case, the federal court concluded that "Caltennco was a mere alter ego or instrumentality of Stephen A. Gunn, used as a conduit for passing loan proceeds siphoned from [a real estate development] project on to other entities for the personal benefit of Mr. Gunn, his wife Sandra W. Gunn, and the objects of their affections." The federal court also determined that Ms. Gunn "participated knowingly and voluntarily in her husband's fraudulent scheme to divert loan proceeds to personal uses." According to the federal court, Mr. and Mrs. Gunn were not credible witnesses. Various documents relating to that federal court case were offered at trial for the purpose of impeaching Ms. Gunn's character for truthfulness. Ms. Gunn's counsel immediately objected, citing Rule 608(b) of the Tennessee Rules of Evidence. The trial court sustained the Rule 608(b) objection but allowed the evidence to be entered as exhibit twenty-five and marked for identification purposes.

In its memorandum opinion, the trial court in this case reversed its earlier evidentiary ruling and admitted exhibit twenty-five into evidence pursuant to Rules 405(b) and 406 of the Tennessee Rules of Evidence. Appellants argue that the trial court erred by admitting this exhibit into evidence. They argued that this error demands outright reversal. According to the appellants, exhibit twenty-five "played a large role" in the trial court's judgment because the court heavily relied upon the federal court's memorandum opinions in that exhibit. Appellants also argue that the trial court "made credibility determinations about witnesses" based on exhibit twenty-five, which "colored the entire process."

We decline to address whether the trial court erred in admitting exhibit twenty-five

---

[13] This post-trial brief is not included in the appellate record, but neither party disputes its existence or its contents.

into evidence because, after considering the whole record, we cannot say that the evidence "more probably than not affected the judgment . . . ." Tenn. R. App. P. 36(b). The trial court primarily relied on the evidence in exhibit twenty-five to substantiate the trial court's own *independent* findings that (1) Sandra and Stephen Gunn were not credible witnesses; and (2) that Innerimages is the alter ego of Ms. Gunn.

For example, after considering the evidence in exhibit twenty-five, the trial court remarked that the credibility of Ms. Gunn and her ex-husband "has been destroyed." Standing alone, it would appear that the trial court's credibility determination was significantly, if not entirely, based on the evidence in exhibit twenty-five. A closer review of the trial court's memorandum opinion, however, reveals that the court had *already independently* determined that

> the credibility of Sandra Gunn and Stephen Gunn had been *seriously damaged* by their demeanor while testifying and their bold assertions in responding to questions not only at trial but in pretrial depositions without ever producing any evidence to support their claims[.]

(Emphasis added.) To support this conclusion, the court specifically and repeatedly identified portions of the Gunns' testimony that the trial court found incredible.

Similarly, in the trial court's alter ego/veil-piercing analysis, the court cited a "very convenient expression of the applicable law" as set forth in a federal court memorandum opinion in exhibit twenty-five. The quoted passage, however, merely articulated factors that a court should consider when conducting an alter ego/veil-piercing analysis. The trial court proceeded to conduct its own independent analysis and made numerous factual findings based on the testimony and exhibits introduced at trial. Although the trial court also quoted liberally from other passages in the federal court memorandum opinions, the court's purpose in doing so is not entirely clear. Some quotations seem to establish the general relevancy of the evidence (i.e., the names of the parties, overlapping dates, etc.). Other quotations contain harsh language directed at the Gunns, which the trial court apparently incorporated for dramatic effect. On balance, however, it appears that the trial court placed greater weight on its own factual findings and legal analysis than on the evidence presented in exhibit twenty-five.

Viewing the trial court's memorandum opinion in its totality, we do not think the court's consideration of exhibit twenty-five "more probably than not affected the judgment . . . ." Tenn. R. App. P. 36(b). Consequently, the consideration of exhibit twenty-five, if erroneous, was harmless.

## IV.

Turning to the substantive issues raised in this appeal, we now consider whether The Village Restrictions are enforceable by the developer against the homeowners. This presents a question of law that we review de novo without affording a presumption of correctness to the conclusions of the trial court. *See* ***Harris v. Aldmon***, No. E2014-002303-COA-R3-CV, 2015 WL 1518599, at *4 (Tenn. Ct. App., filed Mar. 30, 2015), *rehearing granted in part* (Apr. 21, 2015), *no appl. perm. app. filed*. In conducting our legal analysis, however, we will afford a presumption of correctness to the trial court's factual findings, unless the preponderance of the evidence requires otherwise. ***Hicks v. Cox***, 978 S.W.2d 544, 547 (Tenn. Ct. App. 1998). We will also give significant weight to factual findings that "are dependent upon the credibility of the witnesses," because the trial court had the "opportunity to observe the appearance and demeanor of the witnesses." ***St. Clair v. Evans***, 857 S.W.2d 49, 51 (Tenn. Ct. App. 1993) (citing ***Tenn–Tex Properties v. Brownell–Electro, Inc.***, 778 S.W.2d 423 (Tenn. 1989)).

"A property owner's right to own, use, and enjoy private property is a fundamental right." ***Hughes v. New Life Dev. Corp.***, 387 S.W.3d 453, 474 (Tenn. 2012) (citations omitted). "Not surprisingly, then, Tennessee law does not favor restrictive covenants, because they are in derogation of the rights of free use and enjoyment of property." ***Id.*** at 474-75. Generally, restrictive covenants are only enforceable in equity if: (1) the restrictions " 'touch and concern' the land"; (2) the original parties intended that the restrictions would "run with the land and bind remote grantees"; and (3) the remote grantees had notice of the restrictions. ***Gambrell v. Nivens***, 275 S.W.3d 429, 437 (Tenn. Ct. App. 2008) (quoting ***Tennsco Corp. v. Attea***, No. M2001-01378-COA-R3-CV, 2002 WL 1298808, at *2 (Tenn. Ct. App., filed June 13, 2002)).

Here, the trial court determined that The Village Restrictions, as initially drafted, were valid and therefore binding on remote grantees. We agree. The restrictions, which govern the use and appearance of property in The Village, certainly "touch and concern the land." The restrictions also expressly state the developer's intent that the restrictions "run with the title to said land[.]" Finally, the developer presented proof that the restrictions were recorded and appear in the chain of title to each of the defendants' properties, thus putting the defendants on constructive notice.[14]

---

[14] As previously indicated, all of the defendants except Mr. Newman stipulated that The Village Restrictions appear in their respective chains of title. A footnote in defendants' brief reiterates Mr. Newman's position that the restrictions do not appear in his chain of title. However, Mr. Newman provides no argument or citation to authority for his position. Instead, the brief incorrectly states that "the issue was rendered moot by the Court's ruling." The issue is not moot because appellants' brief argues that the trial court correctly ruled on this matter. Because Mr. Newman failed to respond to this argument, we deem the issue waived. *See* Tenn. R. App. P. 36(a).

As the trial court correctly observed, however, a determination that restrictive covenants are valid as initially drafted does not end the analysis. Our courts have recognized several equitable defenses to the enforcement of otherwise valid restrictive covenants, including: laches, waiver/estoppel, abandonment, unclean hands, and radical change in conditions. *See, e.g.*, ***Hackett v. Steele***, 297 S.W.2d 63 (Tenn. 1956); ***Harris v. Aldmon***, No. E2014-002303-COA-R3-CV, 2015 WL 1518599 (Tenn. Ct. App., filed Mar. 30, 2015); ***Wilson v. Woodland Presbyterian Sch.***, No. W2001-00054-COA-R3-CV, 2002 WL 1417064 (Tenn. Ct. App., filed Jun. 25, 2002); ***Scandlyn v. McDill Columbus Corp.***, 895 S.W.2d 342 (Tenn. Ct. App. 1994); ***Elm Hill Homes, Inc. v. Jessie***, 857 S.W.2d 566 (Tenn. Ct. App. 1993). It is important to note that these defenses implicate the *enforceability* of restrictive covenants, not the *interpretation* of them. Accordingly, it is not necessary for us to recite the principles of contract interpretation that we have previously applied when interpreting restrictive covenants. *See, e.g.*, ***Maples Homeowners Ass'n, Inc. v. T & R Nashville Ltd. Partnership***, 993 S.W.2d 36, 39 (Tenn. Ct. App. 1998).

The trial court stated the following with respect to the enforceability of The Village Restrictions:

> As the court has found, Sandra Gunn cannot and has not fulfilled her obligations to the landowners under the covenants and restrictions and because she has committed fraud on the defendants, the covenants and restrictions will be unenforceable as to the four (4) landowners identified in this case, or their successors in title. . . .

On appeal, the parties struggle to label the equitable grounds for the trial court's ruling. Appellants first argue that the trial court erred in determining that The Village Restrictions were unenforceable on the ground that the developer committed "fraud" against the defendants.[15] An action for fraud requires proof of the following elements:

> (1) intentional misrepresentation of a material fact; (2) knowledge that the representation was false—that the misrepresentation was made knowingly or recklessly or without belief or regard for its truth; (3) reasonable reliance on the misrepresentation by the plaintiff and resulting damages; (4) "that the misrepresentation relates to an existing

---

[15] Disturbingly, neither the appellants nor the defendants cite to a single legal authority to support their respective positions on this issue. Despite both parties' noncompliance with Tenn. R. App. P. 27, we choose to exercise our discretion to address the merits of this issue. *See* Tenn. R. App. P. 2; ***Lacy v. HCA Tristar Hendersonville Hosp.***, No. M2017–01055–COA–R3–CV, 2018 WL 575346, at *6 (Tenn. Ct. App., filed Jan. 26, 2018).

or past fact[.]" ***Stacks v. Saunders***, 812 S.W.2d 587, 592 (Tenn. Ct. App. 1990).

***Dog House Investments, LLC v. Teal Properties, Inc.***, 448 S.W.3d 905, 916 (Tenn. Ct. App. 2014). Elsewhere in its memorandum opinion, the trial court found that

> from the very beginning [the developer intended] to practice a fraud as to any homeowners that bought a lot in The Village. The original plat was deceptive by showing inns and conference centers, security gates maintained by the Developer, management companies to handle all day to day operations, recreational areas and drain fields with Anflow sewage systems. . . .

The court also stated that "any attempt to persuade a prospective purchaser on the basis of this grand proposed Anflow sewage system amounts to fraud."

Even assuming, without deciding, that the developer's recorded plats and restrictive covenants contained intentional misrepresentations, a finding of fraud is not warranted. Mrs. Schilt, Mr. Newman, and Mr. White testified that they were unaware of the recorded plats and The Village Restrictions at the time they purchased their homes. Mr. Barrett attempted to testify about oral representations made by his real estate agent, but that testimony was excluded by the trial court as inadmissible hearsay. Accordingly, defendants' own testimony shows that there was no "reasonable reliance" on the alleged misrepresentations made by the developer. We therefore hold that the developer did not commit fraud against the defendants; the trial court erred in concluding otherwise.

Appellants also argue that the trial court erred to the extent that its ruling may have relied on the radical change in conditions defense. The Supreme Court has explained that this defense is only applicable

> when there has been a radical change in the conditions existing when the restrictive covenants were created which completely defeats the objects and purposes of the covenants so that they are no longer effective, and their enforcement would not afford the protection which was in the contemplation of the parties[.]

***Hackett v. Steele***, 297 S.W.2d 63, 67 (Tenn. 1956). For example, in ***Harris v. Aldon***, this Court refused to enforce a "residential only" restriction, in part, because the subject property:

> (a) no longer 'appears' to be part of the subdivision and (b) it

- 13 -

is impossible for [the] property to be used in the manner intended in the original deeds. Real estate expert Richard Smith testified that the property is unsuitable and unmarketable as residential property, and therefore nearly worthless as long as the restrictive covenant is enforced as written.

No. E2014-00203-COA-R3-CV, 2015 WL 1518599, at *12 (Tenn. Ct. App., filed Mar. 30, 2015).[16]

Here, defendants emphasize the radical differences between The Village as it exists today and as it is depicted on recorded plats. That is not the proper inquiry. Rather, one must look to the conditions of the property as it *actually* existed "when the restrictive covenants were created." *Id.* The plats were created three years after the restrictive covenants were recorded and merely identified what the developer hoped would be the *future* conditions of the property. Moreover, unlike the property in *Harris*, which a real estate expert testified was "unsuitable and unmarketable as residential property," the property in The Village can still be converted to residential use. The trial court did make a finding that the 0.18-acre lots "are too small for a septic system with field lines." This does not mean, however, that it is "impossible" to build and sell more homes in The Village. Future residents may choose to purchase multiple lots (like the Whites) or the developer may install a drip system (or other drain fields) to service additional homes. Ms. Gunn also testified, without contradiction, that investors have expressed interest in proceeding with Phase B.

Defendants attempt to shoehorn their argument into the radical change in conditions defense by emphasizing the cases in which we have held that "restrictions lose their force when they fail to serve any useful purpose." *Elm Hill Homes, Inc. v. Jessie*, 857 S.W.2d 566, 571 (Tenn. Ct. App. 1993). However, we have explained that

[w]hen determining whether a restrictive covenant continues to serve any useful purpose, the courts must be concerned primarily with the continuing *value of the restrictive covenant to the entire neighborhood*, not the hardship to the parties attempting to avoid the restrictive covenant[.]

*Harris*, 2015 WL 1518599, at *6 (emphasis added) (quoting *Jones v. Englund*, 870 S.W.2d 525, 528 (Tenn. Ct. App. filed Aug. 20, 1993)). Some of the homeowners admitted at trial that the developer's ability to enforce architectural review restrictions

---

[16] In *Harris*, we also held that the "residential only" restriction was unenforceable because "neighborhood residents have acquiesced in commercial activity" by using the property to sell Christmas trees and wreaths "each Christmas season since the 1980s[.]" *Id.* at *14.

has the potential to increase property values in the entire neighborhood. Similarly, the developer's ability to collect maintenance fees has the potential of facilitating development of the entire neighborhood. It is simply inaccurate to say The Village Restrictions lack any useful purpose. For all of the foregoing reasons, we agree with appellants that the radical change in conditions defense is not applicable.

Nevertheless, appellate courts have the authority to affirm a trial court's decision if it "reached the right result for the wrong reason." **Shutt v. Blount**, 249 S.W.2d 904, 907 (Tenn. 1952) (citing **Sheafer v. Mitchell**, 71 S.W. 86, 87 (Tenn. 1902); **Brooks v. George H. Friend Paper Co.**, 31 S.W. 160, 161 (Tenn. 1895); **Chambers v. Chambers**, 23 S.W. 67, 68 (Tenn. 1893); **Little Rock & M. Railway Co. v. Wilson**, 16 S.W. 613, 614 (Tenn. 1891); **Southern Ry. Co. v. City of Elizabethton**, 10 Tenn. App. 119, 132 (Tenn. Ct. App. 1929)). Here, the trial court's decision can be affirmed by applying the principles articulated in the Restatement (Third) of Property: Servitudes § 6.19(1)-(2), which we take this opportunity to adopt.

We recognize that the homeowners did not seek affirmance of the trial court's decision on the basis of the Restatement. Nevertheless,

> [f]ailure to make the argument before the trial court is not the proper focus of the right result for the wrong reason doctrine. Consideration of the facts in the record and whether additional factual presentation is necessary to resolve the newly-advanced reason is the proper focus of the application of the doctrine.

**Perry v. Commonwealth**, 701 S.E.2d 431, 436 (Va. 2010); *see also* **Robertson v. State**, 829 So.2d 901, 906-07 (Fla. 2002) ("The key to the application of [the right-result-for-the-wrong-reason] doctrine of appellate efficiency is that there must have been support for the alternative theory or principle of law in the record before the trial court."). As we explain below, there are sufficient facts in the record to affirm the trial court's decision on the basis of the Restatement.

In any event, this Court may also exercise its discretion to

> consider other issues [not presented for review] in order, among other reasons: (1) to prevent needless litigation, (2) to prevent injury to the interests of the public, and (3) to prevent prejudice to the judicial process.

Tenn. R. App. P. 13(b). We find it prudent to consider the applicability of the Restatement in order "to prevent injury to the interests of the public." *See id.* As the Supreme Court recently noted, "residential developments subject to restrictive covenants

- 15 -

and governed by homeowners' associations . . . have rapidly proliferated in recent decades." ***Hughes v. New Life Development Corp.***, 387 S.W.3d 453, 475 (Tenn. 2012) (citing Lee Anne Fennell, *Contracting Communities*, 2004 U. Ill. L. Rev. 829, 829 (2004) ("Fennell")). "According to the Community Associations Institute, more than 63,000,000 Americans live in an estimated 323,600 association-governed communities." ***Id.*** Consequently, novel questions relating to the enforceability of restrictive covenants in residential communities are increasingly common. In the absence clear legal standards, it is more difficult for members of the public to order their affairs.

The heart of this controversy is whether a developer who has failed to establish a homeowners association and provides only minimal services may continue to enforce restrictive covenants against residents in a common-interest community. Although this is an issue of first impression in this state, the Restatement directly speaks to it:

> (1) The developer of a common-interest-community project *has a duty to create an association* to manage the common property and enforce the servitudes unless exempted by statute.
>
> (2) *After the time reasonably necessary to protect its interests in completing and marketing the project*, the developer has a duty to transfer the common property to the association, or the members, and to turn over control of the association to the members other than the developer. . . .[17]

Restatement (Third) of Property: Servitudes § 6.19 (emphasis added). Comment (a) explains the rationale for this provision:

> In providing that the developer has an implied duty to create an association, this section reflects widespread development practice and follows modern common-interest-community statutes.
>
> The developer and the purchasers of property in a common-interest community have interests in controlling the common property and the association that may come into conflict. The developer's primary interest is in completing and selling the project, while that of the purchasers is in maintaining their property values and establishing the quality of life they

---

[17] Section 6.19(3) also recognizes an association's right to terminate certain contracts entered into by the developer on behalf of the association. That section is not implicated by the facts of this case. Accordingly, we express no opinion on it.

- 16 -

expected when buying the property. Both the developer and the purchasers have substantial investment interests that are affected by the amount of assessments, the level of maintenance and capital improvements, and the establishment of reserves for future maintenance and replacement of common property. The developer needs to retain control of the association long enough to avoid changes that will jeopardize its ability to sell the remainder, while the purchasers need to stabilize assessments and take charge of the rules governing operation of the community. The longer the developer retains control, the greater the likelihood of conflict. Accordingly, modern common-interest-community statutes specify timetables within which the developer must turn over control to the members.

Comment (b) elaborates:

In determining when control of a project reasonably must be turned over to the members, the percentage of lots or units that have been sold, the interval since the first unit was sold, and the level of the developer's construction and marketing activities are relevant. The Uniform Common Interest Ownership Act [UCIOA] provides a timetable for turnover of control based on these factors. In the absence of a controlling statute, a court may look for guidance to such a timetable in determining when the developer is required to cede control.

Under the UCIOA, the developer of a common-interest community must cede control to a homeowners association under any of the following circumstances:

(1) [60] days after conveyance of [three-fourths] of the units that may be created to unit owners other than a declarant;

(2) two years after all declarants have ceased to offer units for sale in the ordinary course of business;

(3) two years after any right to add new units was last exercised; or

(4) the day the declarant, after giving notice in a record to unit owners, records an instrument voluntarily surrendering all rights to control activities of the association.

UCIOA § 1-103(d).[18]

Thus, under the Restatement, developers have a *common law duty* to create an association and to turn over control "[a]fter the time reasonably necessary to protect its interests in completing and marketing the project[.]" Rest. (Third) of Property: Servitudes § 6.19(1)-(2). The Restatement recommends considering three factors in determining "the time reasonably necessary to protect [the developer's] interests": (1) "the percentage of lots or units that have been sold"; (2) "the interval since the first unit was sold"; and (3) "the level of the developer's construction and marketing activities." *Id.* at § 6.19 cmt. b. In states that have not adopted the UCIOA, such as Tennessee, the Restatement also recommends looking to the UCIOA as a barometer of reasonableness. *Id.*

In the absence of a controlling statute or guidance from the Supreme Court, this Court has the authority to adopt provisions of a Restatement in order to further the development of the common law in this state. *See, e.g.*, **Ward v. Ward**, No. M2014–02237–COA–R3–CV, 2015 WL 6672581, at *7 (Tenn. Ct. App., filed Oct. 30, 2015), *no perm. app. filed* (adopting Restatement (Second) of Torts § 316 (Am. Law Inst. 1965)); **Fye v. Kennedy**, 991 S.W.2d 754, 763 (Tenn. Ct. App. 1998), *perm. app. denied* (Tenn. 1988) (adopting Restatement (Second) of Torts § 920A (Am. Law Inst. (1977)); **Buda v. Cassel Bros., Inc.**, 568 S.W.2d 628, 631 (Tenn. Ct. App. 1978), *perm. app. denied* (Tenn. 1978) (adopting Restatement (Second) of Torts §§ 674, 675 (Am. Law Inst. 1977)).

Although Section 6.19 of the Restatement is relatively new and has only been considered by a few courts,[19] the principles it articulates are not revolutionary. As the Restatement observes, Section 6.19 "reflects widespread development practice." Indeed, one of the primary goals of a developer is to *develop* real estate and turn over control of that property to a self-regulating community. The Tennessee Supreme Court recently acknowledged this fact, albeit in passing. *See* **Hughes v. New Life Dev. Corp.**, 387 S.W.3d 453, 775 (Tenn. 2012). In discussing modern real estate development practices,

---

[18] This section is subject to the limitations set forth in UCIOA § 2-123(g), which governs "master-planned communities" – communities with at least 500 units. *See id.*

[19] At least two courts have cited Section 6.19 favorably. *See, e.g.*, **Retreats at Stone Fountain Condominium Owners Ass'n Bd. v. Wanninger, L.L.C.**, No. 13–0489, 2014 WL 1495494, at *6 (Iowa Ct. App., filed Apr. 16, 2014); **Chesus v. Watts**, 967 S.W.2d 97, 108 (Mo. Ct. App. 1998). We have not identified a single case in which a court has explicitly rejected the Restatement approach. *But see* **Sewall Marshal Condominium Ass'n v. 131 Sewall Ave. Condominium Ass'n**, 46 N.E.3d 96, 135 (Mass. Ct. App. 2016) (declining to adopt Section 6.19(3), which is not implicated in the case at bar); **Asbury Park, LLC v. Greenbriar Estate Homeowners' Ass'n, Inc.**, 271 P.3d 1194, 1200-01 n.4 (Idaho 2012) (holding that a trial court did not have the authority to adopt Section 6.19 but noting that it was "unclear" whether Section 6.19 was even relevant to the facts of the case).

the Court noted that "[t]he developer also *creates an association* to govern the community . . . ." *Id.* (emphasis added). The Court also explained that

> people who live in private developments "are not just opting for private ordering in the form of covenants, *but also are opting for a privatized form of collective decision making that can undo, replace, modify, or augment the private ordering already achieved.*"

*Id.* at 476 (emphasis added) (quoting *Fennell*, *supra* at 848).[20] Requiring developers to create an association and to turn over control after a reasonable time helps ensure that property owners can *actually obtain* the "form of collective decision making" that they bargained for when they purchased their property. *See id.*

For the reasons stated above, we agree with the drafters of the Restatement that developers have a duty (1) to create an association and (2) to turn over control to that association "[a]fter the time reasonably necessary to protect its interests in completing and marketing the project." We therefore adopt Restatement (Third) of Property: Servitudes § 6.19(1)-(2).

In the present case, the trial court intuitively applied the common law rule articulated in the Restatement. The following excerpt from the court's memorandum opinion is illustrative:

> Sandra Gunn protected her intention of never relinquishing control of The Village to a Homeowners Association by requiring the sale of 75% of the lots. If that had occurred, the property owners would assume ownership and responsibility of the subdivision, and if not, 'The Developer shall exercise all rights herein.' The idea of a homeowners association was thwarted from the very beginning. These homeowners in this case have received nothing except grief and torment by Sandra Gunn . . . . She still talks of proposals and when court days get near, the mowing and cleaning up, takes place for the pictures to be taken. . . . It is not really an overstatement at this point after all the proof is in that nothing in the way of those things set out hereinabove has been accomplished in 24 years, except the building and sale of four (4) homes. In its

---

[20] In context, the Court was considering which standard of judicial review should apply when determining the validity of amendments to restrictive covenants in a residential community. *Id.* at 474. Ultimately, the Court held that amendments to restrictive covenants that are "uniform in application and adopted in conformance with [the bylaws of a property owners association], are subject to judicial review principally under an arbitrary and capricious standard." *Id.* at 478 (footnote omitted).

> present condition, the Developer cannot go any further.  The
> Village is at a dead standstill and the poor homeowners are at
> the mercy of Sandra Gunn . . . .

It is evident from this excerpt that the trial court considered (1) "the percentage of lots or units that have been sold"; (2) "the interval since the first unit was sold"; and (3) "the level of the developer's construction and marketing activities."  *See* Rest. (Third) of Property: Servitudes § 6.19 cmt. b.  The trial court also found that the developer had not constructed a new home since 2007.  Under the UCIOA, a developer must cede control "two years after any right to add new units was last exercised."  UCIOA § 1-103(d)(3).  If that is any measure of reasonableness, then ten years without construction of a new home is patently unreasonable.  Although development of Phase B began around the time of trial, we agree with the trial court's implicit determination that these efforts are "too little too late."

The evidence in the record does not preponderate against the court's finding that the developer has only constructed four homes and provided minimal services in the twenty-four years since The Village's conception.  Because the developer has failed to discharge its duty to create a homeowners association and to turn over control "[a]fter the time reasonably necessary to protect its interests in completing and marketing the project," we affirm the judgment of the trial court to the extent that it prohibits the developer from exercising any further control over the defendants and their property.  *See* Rest. (Third) of Property: Servitudes § 6.19(1)-(2).

Appellants complain that "[t]he Trial Court's judgment has left an absolute mess as a practical matter in The Village."  Specifically, appellants say that the court's ruling raises the following questions:

> Who will make decisions about what will happen to the
> private roadways and common areas such as when to pave
> and when to mow?  How would money be collected in order
> to accomplish these purposes, especially if there is not
> unanimous agreement among the owners as to what needs to
> be done, when and at what cost?  Without the structure set
> forth in the Village Restrictions about who maintains the
> roads and common areas, there is chaos.

There is a simple solution:  the developer should *create a homeowners association*.  Once again, the Restatement provides guidance in fashioning an equitable remedy:

> In projects with multiple phases that will be developed over a
> substantial period of time, more flexibility in the required
> transfer of control may be appropriate.  *Sold-out phases of the*

> *project can be given control over the local aspects of the project without jeopardizing the developer's ability to complete the project in accord with the plan.* Subassociations can be used to give local control over budgets for maintenance, design review, and rules for common areas in that part of the project, while allowing the developer to retain control over facilities needed to serve remaining unsold or unbuilt phases and facilities needed for marketing.

Rest. (Third) of Property: Servitudes § 6.19 cmt. b (emphasis added); *see also **Harris***, 2015 WL 1518599, at *12 (rejecting "an 'all-or-nothing' rule [that would] prevent[ ] a court from cancelling or modifying restrictions on equitable principles for only one, or some, of the properties in a subdivision").

Consistent with the foregoing principles, the developer is hereby ordered to create a homeowners association by delivering a charter to the secretary of state's office for filing. The charter and/or bylaws of the association must specify that the association will consist of the defendant homeowners and their successors in title. Members of the association must continue to abide by The Village Restrictions, but the association will have all of the rights and responsibilities of the developer with respect to Lots 1A, 26/12B, 25/12B, 3A, and 6A. The association will also have the responsibility of maintaining the private roads in Phase A that existed at the time of trial. The association may amend The Village Restrictions pursuant to Section C.2 of that document; however, any amendments will only affect the areas of The Village over which the association exercises local control.

The developer may continue to control the remaining lots in The Village, including the common drain field currently servicing the Barrett and Newman lots.[21] The developer may enforce The Village Restrictions, as originally drafted, against owners of property not controlled by the association. These property owners will not become members of the association until the developer has sold seventy-five percent of the lots or until "the time reasonably necessary to protect its interests in completing and marketing the [remaining phases of the] project," measured from the date this opinion is filed. When the developer turns over control of the remaining lots, the property owners in the remaining lots will join the association of the defendant homeowners. At that time, the association will take control of the remaining property in The Village.

Our holding should not be construed as a license for property owners to escape the

---

[21] This is consistent with the Restatement's suggestion to "allow[ ] the developer to retain control over facilities needed to serve remaining unsold or unbuilt phases and facilities needed for marketing." We emphasize, however, that the developer may not continue to charge the defendants fees for any maintenance or improvements to the common drain field.

- 21 -

consequences of valid restrictive covenants before a developer has had a reasonable opportunity to market and develop the property. Our holding should also not be construed as prohibiting developers from specifying a period of developer control in a declaration of restrictions. We merely hold that a developer cannot rely on such a provision to control property in perpetuity. When the developer's authority to enforce restrictive covenants is challenged, courts should consider the principles in the Restatement (Third) of Property: Servitudes § 6.19(1)-(2) in determining whether the developer has discharged its duties to the property owners and/or the property owners association. To the extent that the developer has not discharged its duties under these provisions, courts may exercise their equitable powers to fashion an appropriate remedy.

## V.

Appellants also challenge the trial court's finding that the developer is liable for breach of fiduciary duty. With respect to this issue, the trial court stated the following:

> The next issue of whether or not Sandra Gunn has a fiduciary duty owing to these landowners, is easy to answer. She definitely does. In this case someone must have such a duty. There is no one else but Sandra Gunn, and she stated in her deposition that she did have a fiduciary duty, and for all the reasons stated thus far, she has breached her duties under the covenants and restrictions duly signed and acknowledged before a notary public by the President of Innerimages.

As an initial matter, Tennessee law recognizes two types of fiduciary relationships: relationships that are fiduciary per se (e.g., attorney/client, guardian/ward) and relationships that are "confidential" due to one party's ability to exercise "dominion and control" over another party. ***Foster Business Park, LLC v. Winfree***, No. M2006-02340-COA-R3-CV, 2009 WL 113242, at *12 (Tenn. Ct. App., filed Jan. 15, 2009).

> Because confidential relationships can assume a variety of forms, the courts have been hesitant to define precisely what a confidential relationship is and the court must look to the particular facts and circumstances of the case to determine whether one party exercised dominion and control over another, weaker party.

*Id.* at *13. The existence of a confidential relationship is a question of fact to which a presumption of correctness attaches. *See **Matlock v. Simpson***, 902 S.W.2d 384, 385 (Tenn. 1995).

Here, the trial court found that the developer's relationship to the homeowners was

fiduciary in nature. We will not disturb that finding of fact. Pursuant to The Village Restrictions, the developer dictated rules regarding the appearance and use of all property in The Village. The developer also had the authority to impose assessments on property owners. No deviation from The Village Restrictions was permitted without the developer's approval. The developer also retained the sole right to amend the restrictions until an association was formed. Because the evidence demonstrates that the developer exercised dominion and control over the homeowners, there was a confidential fiduciary relationship.

Courts in other jurisdictions have also held that developers owe fiduciary duties to homeowners and homeowners associations. *See, e.g.*, ***Laurel Road Homeowners Association, Inc. v. Freas***, 191 A.3d 938, 951 (Pa. Cmmw. Ct. 2018); ***Goddard v. Fairways Dev. Gen. Partnership***, 426 S.E.2d 828, 832 (S.C. Ct. App. 1993); ***Richard Gill Co. v. Jackson's Landing Owners' Ass'n***, 758 S.W.2d 921, 924 (Tex. Ct. App. 1988). Reasoning by analogy, some courts compare real estate developers to promoters of a corporation:

> Both are entrusted by interested investors to bring about a viable organization to serve a specific function. Both should be expected to use good judgment and act in utmost good faith to complete the formation of their organization.

*Goddard*, 426 S.E.2d at 832. We think this analogy is appropriate.

Here, the trial court found that the developer was liable for breach of fiduciary duty because the developer "breached her duties under [The Village Restrictions.]" We interpret the trial court's ruling as a determination that the developer did not act in good faith in continuing to develop the property and in providing the services promised under The Village Restrictions. Although the trial court did not resolve all factual disputes with respect to the developer's alleged misuse of funds, it is undisputed that the developer failed to produce an accounting until the discovery phase of this litigation. The evidence does not preponderate against the trial court's findings with respect to this issue. Accordingly, we affirm the trial court's award of $786.50 to Mr. Newman to the extent that such an award was based on a finding of breach of fiduciary duty.

## VI.

Appellants argue that the trial court erred by piercing the corporate veil and holding Ms. Gunn personally liable for the $786.50 awarded to Mr. Newman. "There is no question that the courts may, in appropriate circumstances, pierce the corporate veil and attribute the actions of a corporation to its shareholders." ***CAO Holdings, Inc. v. Trost***, 333 S.W.3d 73, 88 (Tenn. 2010) (citations omitted). "To pierce the corporate veil, a court must be convinced that the separate corporate entity 'is a sham or a dummy' or

- 23 -

that disregarding the separate corporate entity is 'necessary to accomplish justice.' " *Id.* (quoting *Oceanics Sch., Inc. v. Barbour*, 112 S.W.3d 135, 140 (Tenn. Ct. App. 2003)). In deciding whether to pierce the corporate veil, Tennessee courts consider the following "*Allen* factors":

> Factors to be considered in determining whether to disregard the corporate veil include not only whether the entity has been used to work a fraud or injustice in contravention of public policy, but also: (1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole ownership of stock by one individual; (5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the corporation as an instrumentality or business conduit for an individual or another corporation; (8) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation to transfer to it the existing liability of another person or entity; and (11) the failure to maintain arms length relationships among related entities.

*Id.* (quoting *FDIC v. Allen*, 584 F. Supp. 386, 397 (E.D. Tenn. 1984)).  Importantly,

> [t]he conditions under which the corporate entity will be disregarded vary according to the circumstances present in each case and the matter is particularly within the province of the trial court.  Moreover, a determination of whether or not a corporation is a mere instrumentality of an individual or a parent corporation is ordinarily a question of fact . . . .

*Mike v. Po Group, Inc.*, 937 S.W.2d 790, 795 (Tenn. 1996) (quoting *Electric Power Bd. of Chattanooga v. St. Joseph Valley Structural Steel Corp.*, 691 S.W.2d 522, 526 (Tenn. 1985)).

In this case, the trial court made several findings of fact that directly relate to the *Allen* factors.  For example, the court noted that no stock certificates were issued to Ms. Gunn; Ms. Gunn was the sole shareholder of Innerimages; the "office" of Innerimages is Ms. Gunn's home; Ms. Gunn and Innerimages use the same bank; and Ms. Gunn and Innerimages hired the same attorneys.  The court further remarked that the developer's business dealings with Ms. Gunn's ex-husband were "suspect" and had "the appearance

of impropriety." We also note that Ms. Gunn and Innerimages hired the same employees – Jamie and Wayne Click – to perform lawn care and maintenance services. The court's findings implicate at least one third of the *Allen* factors and each finding weighs in favor of piercing the corporate veil. Because the evidence does not preponderate against these findings, we affirm the trial court's decision to hold Ms. Gunn personally liable for the damages incurred by the developer.

## VII.

Finally, the homeowners argue that the trial court erred by denying their request for attorney's fees. Tennessee courts follow the "American Rule," which provides that

> a party in a civil action may recover attorney's fees only if: (1) a contractual or statutory provision creates a right to recover attorney's fees; or (2) some other recognized exception to the American Rule applies, allowing for recovery of such fees in a particular case.

*Eberbach v. Eberbach*, 535 S.W.3d 467, 474 (Tenn. 2017) (quoting *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009)).

The homeowners concede that Tennessee courts follow the American Rule, but argue that "attorney's fees should have been considered as an award of punitive damages as a matter of common law and as now codified under [Tenn. Code Ann. § 29-39-104]." This argument, which was raised for the first time on appeal, is completely without merit. The trial court did not award punitive damages in this case. Even if it had, attorney's fees "are meant to be compensatory, and it is therefore inappropriate to award attorneys' fees as punitive damages." *Bridgefourth v. Santander Consumer USA, Inc.*, No. W2013–02468–COA–R3–CV, 2014 WL 3563470, at *1 (Tenn. Ct. App., filed July 21, 2014) (quoting *Buttrey v. Holloway's Inc.*, No. M2011–01335–COA–R3–CV, 2012 WL 6451802, at *13 (Tenn. Ct. App., filed Dec. 12, 2012)). We therefore affirm the trial court's order denying homeowners their request for an award of attorney's fees.

## VIII.

The judgment of the trial court is affirmed as modified by this Court's opinion. Costs on appeal are taxed to the appellants, Innerimages, Inc., Sandra Gunn, and Cupid's Rose, LLC. The case is remanded for enforcement of the trial court's order as modified by this Court's opinion, and for collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE