IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
June 22, 2022 Session

## GARY HAISER ET AL. V. MICHAEL McCLUNG ET AL.

**Appeal from the Chancery Court for Cumberland County**
**No. 2011-CH-508    Robert E. Lee Davies, Senior Judge**

_____

### No. E2021-00825-COA-R3-CV

_____

This appeal involves a long-running dispute between two groups of property owners in the real estate community development of Renegade Mountain over composition of the board of directors and resultant control of the community organization.  Plaintiffs, members of the Renegade Mountain Community Club, Inc. ("RMCC"), a homeowner's association, brought this action in 2011, seeking a declaratory judgment affirming their status as directors and officers of RMCC.  The Defendants contested the validity of the election at which Plaintiffs were allegedly elected.  Plaintiffs also sought a declaration of whether the purported developer possessed developer's rights.  After two prior appeals and a subsequent retrial, the trial court held that Defendant Moy Toy, Inc., a property owner, does not have developer's rights.  The trial court further ruled that Plaintiffs were properly elected as members of RMCC's board and enforced an easement of enjoyment to use certain property in the development that was designated as "common areas," in favor of Plaintiffs and all other members of RMCC. Defendants appeal.  We vacate the trial court's findings that the parties stipulated that the old golf course property was not "common property," and that Plaintiffs "have no interest" in it because the parties agreed and stipulated only that the old golf course property was "not an issue" in this case.  We affirm the judgment of the trial court in all other respects.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Vacated in Part and Affirmed in Part; Case Remanded

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and JOHN W. MCCLARTY, J., joined.

Scott Hall, Sevierville, Tennessee, for the appellants, Michael McClung, Phillip Guettler, Darren Guettler, and Moy Toy, LLC.

Melanie E. Davis, Maryville, Tennessee, for the appellees, Gary Haiser, Joel Matchak, Renegade Mountain Community Club, Inc., John Moore, and Gerald Nugent.

# OPINION

## I. BACKGROUND

This is the third appeal of this action. In the first appeal, we affirmed the trial court's denial of Plaintiffs' request to certify the case as a class action. *Haiser v. Haines*, No. E2013-02350-COA-R3-CV, 2014 WL 7010723 (Tenn. Ct. App. Dec. 12, 2014). The case has been embroiled in litigation for over a decade. Its factual and procedural history is long and convoluted. Much of the pertinent background has already been established by this Court in the second appeal, *Haiser v. McClung*, No. E2017-00741-COA-R3-CV, 2018 WL 415087 (Tenn. Ct. App. Aug. 29, 2018) ("*Haiser II*"), which we quote in relevant part at length:

> This case involves two consolidated actions brought by opposing boards of directors of a residential development community club, with each board claiming legitimacy. The plaintiffs to the original action were owners of real property in the development who held a special meeting in September 2011 in order to elect a new board of directors for the community club. The previous board of directors and defendants to the original action contested the validity of the election, claiming that none of the counted votes were cast by members in good standing. The defendants subsequently met in November 2011 and again in March 2012 to ratify their positions on the community club board of directors. In December 2011, the "new" board of directors, purportedly elected in September 2011, filed a declaratory judgment action against the original board of directors in the Cumberland County Chancery Court, requesting that the court declare which board of directors was legally in control. The complaint also requested that the court declare whether the purported developer properly possessed developer's rights and that the court award damages to the new board for breach of fiduciary duties by the original board. . . .
>
> In 1972, the [RMCC] was established as a non-profit homeowners' association for Renegade Mountain, and by-laws and restrictive covenants were put in place to govern its operations. . . [T]he original developers . . . adopted the Declaration of Covenants and Restrictions in 1972 for Renegade Mountain, with the stated intention of developing "a residential and commercial community with streets, water and sewer systems, recreational facilities of various types, and other common facilities for the use and benefit of the owners of the said properties described herein." This document granted the developers the ability to plat and improve land and designate certain areas as "common areas" for the use of RMCC members. The

"developer's rights" contained therein also entitled the developers to ten votes for each lot or living unit owned by a developer, as opposed to one vote of regular membership, without the obligation to pay yearly dues. Pursuant to the Declarations, the developer's rights were transferrable[.]

In 1987, RMCC adopted a set of by-laws and amended its restrictive covenants with a new set of controlling documents. The developed and undeveloped real property . . . changed ownership several times over the course of the years along with, purportedly, the developer's rights. The Renegade Mountain development included, over time, a sports complex, a pool, a golf course, gated security, and a network of private roads.

By January 2000, an entity named Cumberland Gardens Acquisitions Corporation had acquired a large portion of real property in Renegade Mountain and allegedly the developer's rights as well. . . . Renegade Resort, LLC, ultimately purchased the real property at Renegade Mountain and interests therein held by Cumberland Gardens Acquisitions Corporation. Joe Looney, an attorney assisting Cumberland Gardens Acquisitions Corporation with the sale of its real property in Renegade Mountain, testified that developer's rights were not discussed during the negotiations concerning this sale. In contrast, Phillip Guettler, a controlling partner of Renegade Resort, LLC, testified that he entered into the transaction believing that the sale included developer's rights.

In March 2000, RMCC held a members' meeting announcing the sale of the properties owned by Cumberland Gardens Acquisitions Corporation to Renegade Resort, LLC. According to the minutes of RMCC taken at this meeting, Edward Curtis, Phillip Guettler, and Michael Haines were elected as directors and officers of RMCC. In June 2000, a meeting of the members of RMCC was conducted. The record indicates that this was the last members' meeting that occurred until 2011.

According to the deposition of Joseph Wucher, Renegade Resort, LLC, began conveying improved and unimproved real property to different entities involved in the development of Renegade Mountain shortly after its acquisition of the real property and purported developer's rights from Cumberland Gardens Acquisitions Corporation. J.L. Wucher Company, owned by Mr. Wucher, was one such entity that purchased property in Renegade Mountain. Another such entity was LKM Group, LLC, which executed a contract to purchase the unimproved real property and

developer's rights of Renegade Resort, LLC, in September 2005. Also in 2005, Mr. Wucher became a member of the RMCC Board of Directors.

On October 26, 2005, a document entitled, "Amended and Restated Declaration of Amended Covenants and Restrictions for Renegade Mountain" ("First 2005 Amendments"), was recorded . . . Among the other changes to the existing declarations and restrictive covenants of Renegade Resort, the First 2005 Amendments granted developer's rights specifically to Renegade Resort, LLC. The First 2005 Amendments were dated October 20, 2005 . . .

Also on October 26, 2005, two additional documents, entitled, "By-laws of Renegade Community Club" ("2005 By-laws") and "Renegade Resort First Amendment to Declaration of Covenants and Restrictions" (collectively, "Second 2005 Amendments"), were filed in the Cumberland County Register of Deeds office. The Second 2005 Amendments are similar to the First 2005 Amendments, with one exception being the specification of "Renegade Resort, LLC, a Tennessee limited partnership," as the developer. . . . The Second 2005 Amendments were signed by the same parties on the same day as the First 2005 Amendments.

. . . The lots owned by LKM Group were later sold to TIG Holdings, LLC, ("TIG Holdings") in March 2011 through a foreclosure sale. On September 28, 2010, Renegade Resort, LLC, and J.L. Wucher Company conveyed the improved and unimproved real property they respectively owned in Renegade Mountain to Moy Toy, LLC ("Moy Toy"), a company owned in part by Michael McClung and, indirectly, Phillip Guettler. [The sellers] also separately conveyed any existing developer's rights they respectively claimed in Renegade Mountain to Moy Toy.

After Moy Toy purchased the improved and unimproved real property and purported developer's rights, Phillip Guettler, acting as the vice president of RMCC, reinstated RMCC as a non-profit corporation with the Tennessee Secretary of State. On June 23, 2011, Phillip Guettler purportedly appointed himself and Mr. McClung to the RMCC Board of Directors.

Subsequently, acting on behalf of RMCC, Mr. McClung and Phillip Guettler ceased maintenance and upkeep of the roads, amenities, street lighting, and private security at Renegade Mountain. By December 2010, the roads were no longer being cleared of winter snow or being repaired, the street lights had been shut off, and the private security had been removed. Throughout 2011,

several homeowners of Renegade Mountain attempted to contact the directors of RMCC, expressing their dissatisfaction with the state of affairs within Renegade Mountain. These homeowners requested that a special meeting be called and also requested access to the financial records and membership lists of RMCC. Receiving no response, a number of dissatisfied homeowners, believing themselves to be members in good standing, organized a special meeting to elect a new RMCC Board of Directors to RMCC and to amend the RMCC by-laws.

On August 24, 2011, TIG Holdings, the holder of 325 of the LKM Group lots sold at a foreclosure sale, executed a document granting Mr. McClung the proxy votes associated with the lots. On September 2, 2011, the homeowners held the special meeting, which Mr. McClung attended as president of RMCC. At the meeting, Mr. McClung appeared and immediately attempted to adjourn, alleging that none of the homeowners calling the special meeting were members in good standing. The gathered homeowners refused to allow adjournment.

During the September 2, 2011 meeting, the homeowners voted the existing Board of Directors out of office with an ostensible majority vote. Mr. McClung challenged this vote by claiming proxy votes for TIG Holdings, which outnumbered the collective votes of the gathered homeowners. The homeowners rejected these proxy votes as invalid, however, asserting that the TIG Holdings' votes were not properly registered in advance and that TIG Holdings was not a member in good standing, having never paid dues since its purchase of real property in Renegade Mountain. The homeowners also rejected Mr. McClung's assertion that Moy Toy could claim ten votes for each of the lots it owned through its purported developer's rights. As a result, Mr. McClung was only able to cast three votes.

After voting the existing RMCC Board out of office, the homeowners voted in a replacement Board ("Owner Board") for RMCC with Joel Matchak, Gary Haiser, and Judy Patterson elected as directors. The homeowners at the September 2, 2011 meeting also approved a new set of amendments to the RMCC by-laws. Contesting the validity of the September 2, 2011 meeting, Mr. McClung and Phillip Guettler executed a document on September 22, 2011, appointing Phillip Guettler's son, Darren Guettler, to the Board of Directors of RMCC. Mr. McClung, Phillip Guettler, and Darren Guettler later held a "properly noticed Annual Meeting of Members" on March 1, 2012, and voted to ratify their positions on the RMCC Board of Directors ("Moy Toy Board").

5

On December 22, 2011, Mr. Haiser and Mr. Matchak, identifying themselves as acting members of the Owner Board, filed a complaint in the [trial court] on behalf of RMCC against Mr. McClung, Mr. Haines, Phillip Guettler, Mr. Wucher, and Moy Toy ("Owner Complaint"). The complaint alleged, *inter alia*, that Renegade Mountain had fallen into a state of disrepair due to the neglect of the defendants and that the Owner Board was properly elected as the RMCC Board of Directors on September 2, 2011, despite the Moy Toy Board's continuing claims. The plaintiffs requested a declaratory judgment as to which Board of Directors controlled RMCC and which set of restrictions and by-laws were in legal effect, as well as damages for breach of fiduciary duty.

Shortly after the Owner Complaint was filed in the trial court, Moy Toy purchased the 325 lots in Renegade Mountain owned by TIG Holdings. On April 10, 2012, the Moy Toy Board filed a separate action in the trial court, individually and on behalf of RMCC, against the individuals on the Owner Board ("Moy Toy Complaint"). The Moy Toy Complaint essentially mirrored the allegations of the Owner Complaint and sought a declaratory judgment determining which Board of Directors was properly in place, an injunction preventing the Owner Board from acting on behalf of RMCC, and damages for allegedly converted funds that the Owner Board had collected as annual assessments.

\*　　\*　　\*

On May 14, 2012, Mr. McClung and Phillip Guettler filed a joint answer to the amended Owner Complaint, denying all substantive allegations and alleging as an affirmative defense that the declaratory judgment action challenging the by-laws was missing indispensable parties. According to the answer, "[i]n order to make such a challenge, the Plaintiffs will be required to join each and every owner subject to the Bylaws and Declarations of Renegade [Mountain]." On May 14, 2012, the Owner Board also filed an answer to the Moy Toy Complaint, denying all substantive allegations and the validity of the Second 2005 Amendments.

\*　　\*　　\*

On July 23, 2013, the Owner Board filed another motion to amend its complaint, adding a request that the trial court order Moy Toy to convey real property classified as "common areas" to RMCC and a request for class

action certification in order to include other property owners in Renegade Mountain as plaintiffs. . . .

\* \* \*

The third amended complaint challenged Moy Toy's purported developer's rights, requested that the trial court order Moy Toy to convey title to all "Common Property" in Renegade Mountain to RMCC, and requested that the court declare RMCC the controlling entity for the private roads of Renegade Mountain.

*Haiser II*, 2018 WL 4150877, at \*1-5 (footnotes omitted).

The trial court held a seven-day trial ending on April 14, 2016. The trial court held, in pertinent part, that (1) neither the Owner Board of Directors nor the Moy Toy Board of Directors was validly elected; (2) Plaintiffs acted in good faith in trying to call the Sept. 2, 2011 meeting, and Moy Toy had unclean hands; and (3) the first and second 2005 Amendments were valid because the statute of limitations to challenge them had run. The trial court made several alternative rulings in the event that its ruling on the statute of limitations issue was reversed, stating:

> As an alternative ruling, if the Court of Appeals determines that the statute of limitations issue does not bar the challenge of the prior recorded Restrictions and By-Laws, the Court finds that based on the evidence that the By-Laws and Amendments recorded in 2005 are invalid because they were not enacted in accordance with their terms. In such event, the By-Laws and Restrictions in 1987 . . . would be the valid By-Laws and Restrictions for Renegade [Mountain]. The 2005 Restrictions and By-Laws were never approved by the members of the RMCC which were required for the amendment to be valid.

> \* \* \*

> [T]he Court has not ruled or determined that Moy Toy is the developer under the 2005 Restrictions which are [the First 2005 Amendments], where Renegade Resorts, LLC named itself as developer. The court has only determined that the [Owner Board] cannot obtain an affirmative ruling from this court that Moy Toy is not the developer because the statute of limitations has run out on that claim for declaratory relief before the [Owner Complaint] was filed. As an alternate ruling in the event the Court is incorrect on the statute of limitations issue, the Court finds that the evidence in this case is

7

that Moy Toy, LLC received no developer rights when it purchased what is now Renegade [Mountain], then Renegade Resorts, LLC and or any other entity. . . . There is no evidence by deed or contract of the legitimate transfer of developer rights to Moy Toy, LLC. The Court finds that though [the First 2005 Amendments] states developer rights existed, they did not exist because there was a breach in title that occurred and these rights were not properly conveyed in the chain of title or possession of such rights to Moy Toy, LLC or its predecessor in title except through what is stated in the 2005 Amended Restrictions.

*Haiser II*, 2018 WL 4150877, at *6, *7.

On the second appeal, this Court did in fact reverse the trial court's statute of limitations ruling, finding that the statute was inapplicable to bar the court from determining the issues of the validity of the First and Second 2005 Amendments and whether Moy Toy had developer's rights. But the *Haiser II* Court also found that Moy Toy should have been allowed to present proof on these issues, concluding as follows:

we determine that the issue of the validity of the 2005 Amendments must be remanded to the trial court for further hearing and determination. On remand, the trial court should allow both sides to present evidence concerning the process of adoption of the 2005 Amendments and whether the requirements for such adoption were properly followed. The validity and applicability of the 2005 Amendments not only affects the issue of Moy Toy's possession of developer's rights but also the remaining issues raised on appeal. . . . The court should allow both sides to present evidence concerning the chain of title of developer's rights in Renegade Mountain.

\*    \*    \*

Having determined that the six-year statute of limitations is inapplicable to the Moy Toy Board's reliance on the 2005 Amendments as valid instruments and that the issue of whether Moy Toy possessed developer's rights must be remanded to the trial court, we are unable to determine . . . whether the special master properly counted 3,363 votes for Moy Toy during such election. For this reason, the August 25, 2017 special election results are vacated. The trial court must first make a determination concerning the issue of whether Moy Toy validly possessed developer's rights before another special election can be held.

The Owner Board contends that the special meeting held on September 2, 2011, was valid because the members calling and attending the meeting were in good standing. . . .

We note that resolution of this issue turns on the applicability and resultant interpretation of the 2005 Amendments. Without a determination by the trial court regarding the validity of the 2005 Amendments, after hearing all of the evidence from both sides, this Court cannot properly rely upon the provisions contained within those Amendments to determine which members were in good standing at the time of the September 2, 2011 special election. This Court also cannot consider whether any prior versions of the Restrictions and/or By-Laws would or should be applied to such determination. Accordingly, we reverse the trial court's ruling on this issue and remand the issue for further determination.

*Haiser II*, 2018 WL 4150877, at \*14-15.

Following the second remand, Defendants filed a motion asserting that all property owners within the resort must be joined in this action in order for the court to have jurisdiction, arguing they are "necessary and indispensable parties." The trial court denied this request, stating, "the Moy Toy Defendants continue to take the position that every owner must be made a defendant. Nowhere in the Court of Appeals' opinion is there any suggestion that this needs to be done on remand."

Later, twenty-one property owners filed a "complaint in intervention" seeking to intervene in this action. The trial court held, "[w]ith regard to any of the Intervenors who were property owners at Renegade Mountain prior to September 2019, the Court finds their motion to intervene is not timely in that they knew or reasonably should have known of their interest in this case when the trial court entered its judgment regarding these issues on June 29, 2016 and when the Court of Appeals entered its judgment on August 29, 2018." The trial court further reasoned as follows:

there is no impairment to any of the Intervenors' ability to protect their interest because the relief which all of the Intervenors are requesting and the position which all the Intervenors are taking is identical to that of Moy Toy's. . . . If either party to the underlying suit can adequately represent the Intervenors' interest, then the intervention serves no purpose. That being the case, the Intervenors are not necessary and indispensable parties to this proceeding.

9

The trial court allowed two landowners who acquired their property after September 2019 to intervene but barred them from raising "any new theories, claims, defenses, or issues of fact which have not been disclosed by Defendant Moy Toy in discovery."

Before the retrial, Defendants filed motions in limine arguing that the action should be dismissed for lack of standing and failure to join all necessary and indispensable parties. The trial court denied these motions.

The lengthy retrial began in September and ended in December of 2020. The trial court entered an extensive 36-page order of judgment containing detailed factual findings and legal conclusions. As summarized by Defendants in their appellate brief, the trial court generally held:

(1) that Moy Toy has no developer rights, such rights not having been conveyed in a previous foreclosure on the last developer identified by the Court, Cumberland Gardens Limited Partnership, thus breaking the chain of title leading to Moy Toy. Alternatively, any such developer's rights were conveyed to an entity other than Moy Toy, LKM Group, LLC.;

(2) the 2005 Amendments [and] bylaws were all invalid, having been improperly adopted, wherein Moy Toy was deemed to have failed in carrying its burden of proof regarding their validity;[1]

(3) the specially-called RMCC meeting of September 2, 2011, was legitimate and the Court endorsed actions taken there, reinstating the board as composed of the Plaintiffs;

(4) an easement of enjoyment for the benefit of Plaintiffs was imposed on common areas and properties otherwise belonging to Moy Toy. In furtherance of that the Trial Court invoked reliance on *Innerimages, Inc. v. Newman*, 579 S.W.3d 29 (Tenn. [Ct. App.] 2019)[.]

(5) Unplatted roads, on Moy Toy's property, currently in use by residents were to be maintained and controlled by RMCC, though Moy Toy was free to redevelop such trails thereafter as it wished.

(Citations to record omitted; footnote added). Defendants Michael McClung, Phillip Guettler, Darren Guettler, and Moy Toy, LLC, filed a timely notice of appeal.

---

[1] Defendants have not appealed the trial court's ruling that the First and Second 2005 Amendments are invalid and "null and void."

## II. ISSUES

We address the following issues raised by Defendants:

1. Whether the trial court erred in holding that the proposed intervenors who owned property prior to September 1, 2019, were not necessary and indispensable parties, and denying their request for joinder in the case.

2. Whether the trial court erred in holding that Plaintiffs had standing to challenge Moy Toy's entitlement to developer's rights.

3. Whether the trial court erred in ruling that Moy Toy had no developer's rights.

4. Whether the trial court erred by holding that Plaintiffs' actions were not barred by the statute of limitations.

5. Whether the trial court erred in holding that all members of RMCC, including Plaintiffs, have an easement of enjoyment to use the roads and all common areas of the community development.

6. Whether the trial court erred in upholding the September 2, 2011 special election where the board consisting of Plaintiffs was elected.

Plaintiffs, in their posture as appellees, raise the following additional issues:

7. Whether the trial court erred in its definition of common properties in Renegade Resort.

8. Whether the trial court erred in holding that Plaintiffs have no interest in the former golf course property of the resort.

## III. STANDARD OF REVIEW

Our review of this non-jury case is *de novo* upon the record with a presumption of correctness as to the findings of fact unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000). "In order for the evidence to preponderate against the trial court's findings of fact, the evidence must support another finding of fact with greater convincing effect." *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2006). "The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary." *Haiser II*, 2018 WL 415087, at *10 (citing *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002)). Our review of the trial court's

conclusions of law, including its interpretation of a written agreement, is *de novo* with no presumption of correctness.  *See Dick Broad. Co. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 659 (Tenn. 2013); *Ray Bell Constr. Co., Inc. v. State, Tenn. Dep't of Transp*., 356 S.W.3d 384, 386 (Tenn. 2011).

## IV. ANALYSIS

## A. Proposed Intervenors' Request to Intervene

Defendants argue that the trial court erred in denying the proposed intervenors' motion to intervene, which was first made by twenty-one landowners after roughly eight and a half years of litigation, a week-long first trial, and two appeals.  The trial court noted the proposed intervenors' "position that as homeowners, they do not wish their HOA fees to increase because of expenses which may be associated with the development and maintenance of the common area[s] in the event Plaintiffs are successful."  The proposed intervenors also "assert[ed] that it is their unified position the 2005 first amendments are valid and binding, and that Intervenors are 'diametrically opposed' to the claim of Plaintiffs that Moy Toy lacks developer rights which were lost by way of a broken chain of title of a previous developer."

Our standard of review of this issue is as follows:

> The standard of review on appeal for the denial of intervention as of right is de novo, except for the timeliness of the application which is reviewed under an abuse of discretion standard.  *Michigan State AFL-CIO* [*v. Miller*], 103 F.3d [1240] at 1245 [(6th Cir.1997)]. The standard of review for the denial of permissive intervention is abuse of discretion.  *Chaille v. Warren*, 635 S.W.2d 700, 703 (Tenn. App. 1982).  An abuse of discretion exists when the reviewing court is firmly convinced that the lower court has made a mistake in that it affirmatively appears that the lower court's decision has no basis in law or in fact and is therefore arbitrary, illogical, or unconscionable.  *See Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996); *State v. Carter*, 890 S.W.2d 449, 454 (Tenn. Crim. App. 1994).

*Parking Guys, Inc. v. Metro. Gov't. of Nashville & Davidson Cnty. ex rel. Traffic & Parking Comm'n.*, 605 S.W.3d 451, 460 (Tenn. Ct. App. 2019) (quoting *State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 191 (Tenn. 2000)).

In support of their motion to intervene, the proposed intervenors stated to the trial court that they "assert four means by which the Court may permit their intervention in this case: 1) pursuant to Tenn. R. Civ. Rule 24.0[1] (Intervention as of Right); 2) Tenn. R. Civ.

Rule 24.02 (Permissive Intervention); 3) Tenn. R. Civ. Rule 19.01; and 4) T.C.A. § 20-1-115."[2]  Rule 24.01 provides that

> [u]pon timely motion any person shall be permitted to intervene in an action: (1) when a statute confers an unconditional right to intervene; or (2) when the movant claims an interest relating to the property or transaction which is the subject of the action and the movant is so situated that the disposition of the action may as a practical matter impair or impede the movant's ability to protect that interest, unless the movant's interest is adequately represented by existing parties; or (3) by stipulation of all the parties.

In *State v. Brown & Williamson*, the Supreme Court explained the burden of a potential intervenor as follows:

> A party seeking to intervene as of right under Rule 24.01 must establish that (1) the application for intervention was timely; (2) the proposed intervenor has a substantial legal interest in the subject matter of the pending litigation; (3) the proposed intervenor's ability to protect that interest is impaired; and (4) the parties to the underlying suit cannot adequately represent the intervenor's interests.  *Grubbs v. Norris*, 870 F.2d 343, 345 (6th Cir.1989). The intervenor has the burden of establishing all four of these elements or else the motion to intervene will be denied.

18 S.W.3d at 190-91.  The trial court analyzed the motion to intervene in light of these four elements and held:

> With regard to any of the Intervenors who were property owners at Renegade Mountain prior to September 2019, the Court finds their motion to intervene is not timely in that they knew or reasonably should have known of their interest in this case when the trial court entered its judgment regarding these issues on June 29, 2016 and when the Court of Appeals entered its judgment on August 29, 2018.  Thus, with regard to all Intervenors who owned

---

[2] On appeal, Defendants assert that the trial court should have applied Tenn. Code Ann. § 29-14-107(a), which provides that "[w]hen declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceedings."  However, it appears that nowhere in the pleadings filed by potential intervenors or Defendants did they ever cite this statute or ask the trial court to apply it.  Therefore, this issue has been waived for failure to raise it with the trial court. *See, e.g., Black v. Blount*, 938 S.W.2d 394, 403 (Tenn. 1996) ("Under Tennessee law, issues raised for the first time on appeal are waived.").  Moreover, we observe that none of the proposed intervenors is listed on the notice of appeal, so it is not clear that any of them are even participants in this appeal.

property prior to September 1, 2019, the Court finds their motion is untimely for the reasons set forth above.

With regard to the other elements set forth in *State v. Brown & Williamson*[,] the Court finds that there is no impairment to any of the Intervenors' ability to protect their interest because the relief which all of the Intervenors are requesting and the position which all the Intervenors are taking is identical to that of Moy Toy's. While it is true that the intervenors' interests are diametrically opposed to that of Plaintiffs, they are in lockstep with the positions of Moy Toy. If either party to the underlying suit can adequately represent the Intervenors' interest, then the intervention serves no purpose. That being the case, the Intervenors are not necessary and indispensable parties to this proceeding.

This Court has set forth the factors to consider in determining whether a motion for intervention is timely as follows:

The timeliness of an intervention is governed by equitable principles, and is determined by the facts and circumstances of each particular case. In determining whether an intervention is timely, courts consider the following factors:

(1) the point to which the suit has progressed; (2) the purpose for which intervention is sought; (3) the length of time preceding the application during which the proposed intervener knew or reasonably should have known of his interest in the case; (4) the prejudice to the original parties due to the proposed intervener's failure after he knew or reasonably should have known of his interest in the case to apply promptly for intervention; and (5) the existence of unusual circumstances militating against or in favor of intervention.

*In re Estate of Smith*, No. W2017-02035-COA-R3-CV, 2018 WL 4859045, at \*5-6 (Tenn. Ct. App. Oct. 8, 2018) (quoting *Am. Materials Techs., LLC v. City of Chattanooga*, 42 S.W.3d 914 (Tenn. Ct. App. 2000); internal citations omitted).

The trial court correctly analyzed the proposed intervenors' claim for intervention as of right under Rule 24.01. We find no abuse of discretion in the trial court's decision that the motion was not timely filed by proposed intervenors who owned property before September of 2019. As the trial court held, they knew or should have known of this case and their interest in it and waited to file their motion until a very late point in the proceedings. Furthermore, there is no error in the trial court's finding that the proposed

14

intervenors were not necessary and indispensable parties, because all of their positions were "in lockstep with the positions of Moy Toy" and thus adequately represented.

Regarding permissive intervention, Tenn. R. Civ. P. 24.02 provides that "[u]pon timely motion any person may be permitted to intervene in an action: (1) when a statute confers a conditional right to intervene; or (2) when a movant's claim or defense and the main action have a question of law or fact in common." The trial court ruled that only those proposed intervenors who bought property after September of 2019 filed timely, stating:

> the Court will not consider permissive intervention for any property owners with a recorded interest prior to September 2019 because of their failure to show proper diligence in the timeliness of their request for intervention. *American Materials Tech., LLC. v. City of Chattanooga*, 42 S.W. 3d 914, 916 (Tenn. Ct. App. 2000).

> In exercising its discretion for the remaining Intervenors, the Court was concerned with the potential prejudice to the Plaintiffs regarding discovery. However, counsel for Intervenors stipulated that his clients would waive discovery, be bound by the discovery responses of Moy Toy, and be ready for trial in September 2020.

> In balancing all of the above interests, the Court, exercising its discretion, will allow the Intervenors set forth in the complaint who had an interest in the Renegade Mountain Resort after September 1, 2019 to proceed as parties in this case. However, Intervenors will be prohibited from introducing any new theories, claims, defenses, or issues of fact which have not been disclosed by Defendant Moy Toy in discovery. All other Intervenors have failed to qualify under Rule 24.02 as being untimely.

As we have already held, the trial court did not abuse its discretion in finding the majority of the proposed intervenors did not timely file their motion to intervene. Our Supreme Court has observed that in exercising the discretion afforded under Rule 24.02, "the court must consider whether the intervention will unduly delay or otherwise prejudice the rights of the original parties." *Brown & Williamson*, 18 S.W.3d at 192. In this case, as in *Brown & Williamson,* "it cannot be said that the trial court's denial of permissive intervention had no basis in law or fact or was otherwise arbitrary, illogical, or unconscionable[.]" *Id.* at 192-93.

Tennessee Rule of Civil Procedure 19.01 requires joinder of a party who is indispensable and necessary to an action. It provides in pertinent part:

A person who is subject to service of process shall be joined as a party if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest, or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reasons of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party.

This Court has recently reiterated that "[o]nly a party who will be directly affected by a decree *and whose interest is not represented by any other party to the litigation* is an indispensable or necessary party, that is, one without which no valid decree may be entered settling the rights between the parties that are before the [c]ourt." *Locke v. Locke*, No. M2021-01454-COA-R3-CV, 2022 WL 3650806, at \*4 (Tenn. Ct. App. Aug. 25, 2022) (quoting *Moore v. Teddleton*, No. W2005-02746-COA-R3-CV, 2006 WL 3199273, at \*6 (Tenn. Ct. App. Nov. 7, 2006)).

In this case, the trial court expressly held that "the Intervenors are not necessary and indispensable parties to this proceeding" as a result of its finding that "there is no impairment to any of the Intervenors' ability to protect their interest because the relief which all of the Intervenors are requesting and the position which all the Intervenors are taking is identical to that of Moy Toy's." The positions taken and arguments presented in the proposed intervenors' complaint in intervention − that none of the Plaintiffs "are duly elected as purported or putative members of any alleged Board of the RMCC," that "the 2005 First Amendments are valid and binding," and that Moy Toy has valid developer rights on Renegade Mountain − were all identical to Moy Toy's strenuously-litigated positions at trial. As in *Moore* and *Locke*, the proposed intervenors were correctly determined not to be necessary and indispensable parties for purposes of Rule 19.01. *See Locke*, 2022 WL 3650806 at \*5 ("any interest [the proposed intervenor] may have held in the Disputed Property was represented by Defendants"); *Moore*, 2006 WL 3199273 at \*7 ("although [the proposed intervenor] was affected by the chancellor's decree in the Kyle suit, he and the Moores would appear to have had an identity of interests").[3]

---

[3] We apply a similar analysis and reach the same result under Tenn. Code. Ann. § 20-1-115, which is quoted only in passing in Defendant's brief, and states, "[i]n actions for the recovery of property, any person not a party to the action, on showing interest in the subject matter of the suit, *may be* allowed to appear as defendant in the action." (Emphasis added). The language of the statute is permissive, which suggests that the trial court is afforded discretion in determining its application. Defendants cite no authority interpreting it, which is unsurprising given that our research indicates only fourteen appellate opinions citing it, half of which were issued in the nineteenth century.

16

## B. Standing

Defendants argue that the trial court should have held that Plaintiffs have no standing to "effectively intervene in th[e] contract arrangement[s]" composing the chain of title to the rights at issue here, including the pivotal question of developer's rights. In *Haiser II*, however, this Court expressly directed the trial court to "allow both sides to present evidence concerning the chain of title of developer's rights in Renegade Mountain." 2018 WL 4150877, at \*14. The issue of standing, first raised by Defendants after two appeals to this Court and at least eight years of litigation, is thus outside the scope of *Haiser II*'s mandate upon remand.

In *Lovlace v. Copley*, 418 S.W.3d 1, 17 (Tenn. 2013), the Supreme Court observed that "[w]hen a statute creates a cause of action and designates who may bring an action, the issue of standing is interwoven with that of subject matter jurisdiction and becomes a jurisdictional prerequisite." (quoting *Osborn v. Marr*, 127 S.W.3d 737, 740 (Tenn. 2004)). In this case, Defendants do not cite or rely upon such a statute creating a cause of action or designating who may bring an action. They merely argue as follows:

> Plaintiffs were attacking the contractual arrangements between third parties in their effort to establish that such contract did not come with the contingent developer's rights. . . . As strangers or third parties to this contract, Plaintiffs herein have no standing to effectively intervene in this contract arrangement long after the fact, where there is no evidence they were intended third party beneficiaries of it.

The opinion issued in *Haiser II* constitutes the law of this case upon remand. As we have stated, *Haiser II* expressly directs the trial court to allow and consider evidence from both sides regarding whether developer's rights transferred to Moy Toy. Under the particular circumstances presented by the long odyssey of this case, the question of Plaintiffs' standing was not "interwoven with that of subject matter jurisdiction" as in *Lovlace*. We find no error in the trial court's decision to follow *Haiser II*'s mandate and reject Defendant's untimely attempt to raise standing as a defense.

## C. Statute of Limitations

In their appellate brief, Defendants argue that "[a]fter *Haiser II* returned the case to the Trial Court to retry certain issues, Defendants . . . renewed [their] argument that Plaintiffs' effort to seek construction of Moy Toy's developer rights, through declaratory action, was barred under the six-year limitations period governing contract rights, pursuant to Tenn. Code Ann. § 28-3-109(a)(3)." This argument is made despite the fact that a primary focus and holding of *Haiser II* was "that § 28-3-109(a)(3) is inapplicable to the

17

case at bar. We therefore reverse the trial court's ruling that the 2005 Amendments were valid due to expiration of the six-year statute of limitations." 2018 WL 4150877, at *13. Defendants' "renewed" argument regarding the statute of limitations is without merit.

## D. Developer's Rights

Defendants argue that the trial court erred in finding that Moy Toy did not have developer's rights. In this case, it appears that the primary, and perhaps only, practical significance of the developer's rights at issue pertains to voting rights to determine control of the RMCC.[4] A holder of developer's rights does not have to pay yearly dues to maintain good standing in the community association. Only members in good standing are able to cast a vote. A holder of developer's rights also would have ten votes for each residential unit owned by the developer, as opposed to a single vote allowed an ordinary resident.

In 1991, the owner of the remaining unsold lots and undeveloped land was an entity called Cumberland Gardens Limited Partnership. It defaulted on loans made from a German bank, and Cumberland County attorney Joseph Looney, acting as substitute trustee, foreclosed on the property in June of 1991. A primary issue at trial was whether developer's rights transferred at foreclosure, because if not, then there were no developer's rights passed along the chain of title to Moy Toy. The trial court summarized the testimony it heard as follows, in pertinent part:

> Mr. Looney prepared the trustee's deed for DG Bank that transferred the property at foreclosure to Cumberland Gardens Acquisitions Corp ("CGAC"). According to Mr. Looney, the sole purpose of the trustee's deed was to take title in the property, and only the real property was conveyed. No personal property was conveyed, and Mr. Looney testified that developer's rights were not discussed when CGAC received the property at foreclosure. CGAC was the wholly owned subsidiary of DG German Bank. Mr. Looney had no knowledge of the original loan documents between DG Bank and Cumberland Gardens Limited Partnership; however, his client's (CGAC's) intent was to maintain the property as a whole for sale. CGAC was not interested in developing the property and over the nine years that CGAC owned the property, there was no development at all. Its goal was simply to maintain the property for a potential buyer, and the only marketing which was done was for attracting players to the golf course.
>
> Edward Hill, an attorney from Connecticut represented Renegade Resort, LLC, the buyer in the transaction with Cumberland Gardens Acquisition

---

[4] It appears undisputed that no significant traditional "development," in the sense of marketing or selling lots, or construction, has been done on Renegade Mountain for at least thirty years.

18

Corp. . . . Mr. Hill dealt mainly with Mr. Looney, the authorized representative for CGAC, and it took approximately a year to negotiate the contract. At the time, Renegade Resort, LLC was acquiring an eighteen-hole golf course, a lodge, and a water system which was being run by CGAC. Although Mr. Hill believed the contract for sale contained language in paragraph 1.01 ("All rights in connection therewith") which would include developer rights, he acknowledged that nowhere in any of the purchase and sale documents was "developer rights" ever mentioned. His testimony is also consistent with Mr. Looney's testimony that the issue of developer rights was never brought up between the two negotiators. Schedule 101B to the contract for sale is a schedule of intangible personal property which is being transferred to the buyer; however, it fails to list developer rights. Although Mr. Hill indicated that this was not an exhaustive list of intangible personal property, one would expect to see these rights if they were as important to the transaction as indicated by Mr. Hill. Perhaps the explanation for Mr. Hill's conduct concerning developer rights is because he had a title insurance policy which protected his client. As a result, he intentionally did not investigate whether Cumberland Gardens Acquisition Corp obtained developer rights when it foreclosed on the German developers.

*      *      *

Each side presented expert proof. The Owner board called Jack Atkins and Moy Toy called Joe Huey. Both Mr. Huey and Mr. Atkins have been practicing attorneys since the 1970's or 1980's. Both of these gentlemen made excellent witnesses. Each was well qualified, gave straightforward answers, and advocated for their client's positions.

Mr. Atkins testified that developer rights are based upon the restrictive covenants and the plat recorded in the Register of Deeds office. These documents establish the developer's rights to govern the homeowner's association and add property to the development, along with amenities. In this particular case, Mr. Atkins noted that no property has been added to the plan since 1987, and there has been no development since that time. Mr. Atkins noted that the substitute trustee's deed to Cumberland Gardens Acquisition Corp on June 4, 1991 did not have broad language that could arguably include developer rights such as "all rights, title and interest." This deed only conveyed real property, no personal property. When CGAC conveyed the property to Renegade Resort, LLC on January 6, 2000, it was the same property that CGAC received from the trustee's deed in 1991. The only evidence of developer rights was when Wucher and Renegade conveyed

19

the property to Moy Toy. Those bills of sale do have specific language which includes developer rights. However, Atkins opined that neither Wucher nor Renegade had developer rights to convey in the first place because it does not appear that CGAC retained developer rights when it received the property from the DG German bank upon foreclosure. The only purpose of this corporation was to sell the property. There was never any development, only maintenance.

*    *    *

Joe Huey was actually involved when Moy Toy purchased the property. Mr. Huey reviewed the chain of title performed by Atkins, Atkins' prior affidavit, Ed Hill's deposition, and Joe Looney's trial testimony. . . . Although Mr. Huey indicated that Mr. Atkins limited himself to looking only at the deeds, that conclusion is incorrect. If Mr. Huey focused only on the Atkins affidavit, that might be true, but Mr. Atkins' trial testimony went far beyond the deeds. Mr. Huey did agree that Joe Looney's substitute trustee deed only conveyed real property, and that Mr. Looney indicated he did not believe that CGAC maintained any developer rights to convey. Mr. Huey also acknowledged that although Ed Hill and Mr. Looney negotiated for many months over this particular transaction, there was no specific mention of developer rights being conveyed. Finally, Mr. Huey admitted that his opinion was based upon the assumption that DG Bank acquired developer rights in its security instruments when it foreclosed on Cumberland Gardens.

After assessing this testimony, the trial court concluded:

when Attorney Edward Hill representing Renegade Resort, LLC negotiated the purchase of the property, neither he nor Mr. Looney ever discussed developer rights, and there is no evidence in any of the ancillary documents such as the contract for sale that mentions the transfer of developer rights in the property. The Court concludes that at the time CGAC transferred the property to Renegade Resort, LLC, it had no developer rights to convey. Joe Looney's testimony indicated that all he intended to transfer was the real property and no personal property. He also indicated that there was no other collateral document which existed to transfer developer rights to Renegade Resort, LLC. Thus, there was a break in the chain of title where developer rights were not transferred in the foreclosure sale and the substitute trustee's deed from Cumberland Gardens Limited Partnership to Cumberland Gardens Acquisition Co. While Mr. Hill and Renegade Resort, LLC may have possessed the intent to purchase developer rights from CGAC, this intent was

20

never communicated either orally or in any document. On the other hand, Mr. Looney testified that he intended to convey only the personal property identified in the bill of sale, and developer rights were not included. Both parties had excellent attorneys representing them, the negotiations lasted for a year, so if developer rights were intended to be included, they would have been mentioned or referenced somewhere in the conveyance documents. Since Renegade Resort, LLC did not acquire title to developer rights through the chain of title, Moy Toy cannot possess developer rights because of this break in the chain of title.

Developer's rights "are typically held and exercised by a real estate developer, and can be encumbered under a mortgage or deed of trust held by a lender who finances such a development." *Civis Bank v. Willows at Twin Cove Marina Condo. & Home Owners Ass'n, Inc.,* No. E2016-00140-COA-R3-CV, 2016 WL 7468202, at *5 (Tenn. Ct. App. Dec. 28, 2016). They are also sometimes called "declarant's rights." *Id.*; *see also Tenn. Funding, LLC v. Worley*, No. M2018-01099-COA-R3-CV, 2019 WL 631243, at *3 (Tenn. Ct. App. Nov. 26, 2019). In *Civis Bank*, we observed that "[t]he Supreme Court addressed the issue of whether such rights were transferred in a sale from the initial property developer to a successor developer in *Hughes v. New Life Dev. Corp.*, 387 S.W.3d 453, 465-67 (Tenn. 2012)," and concluded as follows:

> We glean two pertinent points from the *Hughes* decision. First, . . . developer's or declarant's rights can be transferred by general language. Specific and precise language describing what property is to be conveyed is preferable and potentially more effective. But *Hughes* teaches that a general transfer of, for instance, "all personal property" or "all contract rights" can be effective to transfer declarant's rights, provided the intent to make such a transfer is evident from an examination of the pertinent documents and the conduct of the parties. . . .
>
> Second, the Supreme Court in *Hughes* strongly suggests that as a general matter, declarant's or developer's rights are personal interests, which, although freely transferable, do not run with the land. *Id*. at 466-67.

*Civis Bank*, 2016 WL 7468202, at *6; *see also Tenn. Funding*, 2019 WL 6331243, at *3 ("Unlike restrictive covenants, declarant's rights are not property interests; they are considered personal property.").

In the present case, many of the ancillary transactional work product documents, such as loan agreements, security instruments, or other documents describing the rights relative to the transfer of property, were destroyed by Mr. Looney in the ordinary course

of business due to the passage of time, before he became aware of this litigation. The trial court thus properly relied on the testimony of the witnesses to ascertain their intentions at the time the property was transferred in foreclosure to Cumberland Gardens Acquisitions Corp. in 1991. Defendants argue that the trial court "misstated, mischaracterized and failed to give proper effect to the testimony of the witnesses." We disagree. The evidence does not preponderate against the trial court's findings, as summarized in the lengthy quote above from the trial court's judgment. Mr. Looney was asked "what did you intend to convey?" He responded, "It was real property . . . It had no personal property─we conveyed no personal property." Mr. Looney also testified, "I have no recollection of developer rights being mentioned at any time during the course of these negotiations, and I think we went over this last time and concluded that this bill of sale does not mention developer rights."

Mr. Hill, the attorney who represented Renegade Resort, LLC, testified as follows in his deposition:

> Q. Are developer rights listed anywhere in any deed or any document that you've encountered, as far as a conveyance to Renegade Resort, LLC, specifically using those words?
> THE WITNESS: You and I both looked at the deed and the bill of sale. And I -- and that term is not used in the -- in those documents. It's not used in the contract. And I would have to review every other one of the documents in the closing binder to answer your question completely.
> Q. Are you aware of one, such a document?
> A. As I sit here, no. But I don't remember what the other documents were.
> Q. Okay. Were developer rights ever discussed with anyone?
>
>          \*       \*       \*
>
> THE WITNESS: I don't think that we ever said that term was ever used throughout all of the discussions. It was always presumed.

The trial court's findings were informed in significant part by its ability to view and assess the demeanor and credibility of the witnesses on both sides. The evidence supports the trial court's findings. We affirm its decision that no developer's rights passed to Cumberland Gardens Acquisitions Corp. in 1991, and therefore none passed through the chain of title to Moy Toy.

22

## E. Validity of September 2, 2011 Board of Directors Special Election

The trial court, addressing the questions of who possessed a valid vote and whether the September 2, 2011 election of the owners' board of directors was properly conducted, held that "there were findings made by the prior trial court which were not appealed, and therefore were final determinations which could not be retried." Among those, the trial court found:

1. The Moy Toy Board consisting of Phillip Guettler, Michael McClung and Darren Guettler was not elected by the membership. Instead, they appointed themselves and their family as board members, which was not in compliance with state statutes or the relevant bylaws.

2. The Plaintiffs . . . acted in good faith in attempting to call the September 2, 2011 meeting. The residents in Renegade Resort made repeated requests to the Moy Toy Board to see the books and minutes of the RMCC. Those requests were ignored. The indifference demonstrated by the Moy Toy Board regarding the termination of services in the resort in 2010 and 2011 would have upset any reasonable resident.

3. Moy Toy, LLC, Michael McClung and Phillip Guettler had unclean hands in its action towards the residents of Renegade Mountain.

(Paragraphs renumbered). The trial court found as follows in pertinent part regarding the story of the contested election:

Once Moy Toy took over, there was no communication with any of the homeowners in 2010. Both McClung and Guettler and later, Guettler's son, claimed to be the only board members of the RMCC from 2011 to 2016. . . . In 2011, McClung appointed himself as president of the RMCC. McClung directed that the streetlights be turned off. He also terminated the guards at the guardhouse. Moy Toy has never marketed, has never advertised any lots for sale, and has conducted no development since its purchase in 2010. It has never prepared a development plan or any proposed plats. As a result of its purchase, Moy Toy owned three condominiums, the two German houses inside the platted properties, and twenty-five hundred additional acres of unplatted lots. This is the same status that existed at the time of trial, ten years later. Not a single lot has been developed.

For reasons that remain unexplained, Moy Toy never sent an invoice to the homeowners to pay dues in 2011. In fact, the first statement sent by Moy

Toy for dues occurred in January of 2012, and it was an invoice for 2011 and 2012 dues.

The winter of 2010 - 2011 was a tough one. Moy Toy stopped clearing the roads of snow. When spring approached in 2011, Moy Toy failed to mow the common areas. Two culverts collapsed in 2011. Although Moy Toy paid for the stone, the labor was provided by the residents.

One of the owners, John Moore, began meeting with his neighbors. Together, they created a list of complaints, which Moore presented to McClung in April 2011. When the meeting produced no results, the residents then requested records from the officers that were identified by the filings in the Secretary of State's office. Again, there was no response.

The homeowners, lead by Moore, decided to call a special meeting of the homeowners. Gerald Nugent sent a letter dated June 23, 2011 to the registered agent for the RMCC requesting a special meeting. Mr. Nugent bought a lot on Renegade Mountain in 1987. He testified that at the time he wrote his letter in June 2011, the gated community was gone; the golf course, along with the swimming pool and tennis courts were closed. Mr. Nugent paid his dues in 2010 at the rate of $20 a month; however, since he received no invoice for 2011, he did not pay anything. The residents then attempted to qualify various homeowners as members in good standing by requesting records and cancelled checks for dues which had been paid in 2009 for the 2010 year. After going through the cancelled checks, the residents came up with twenty-seven members who were considered to be in good standing for 2010. . . .

The meeting on September 2, 2011 took place. . . . McClung initially chaired the meeting and objected to the calling of the meeting. Moy Toy contended that the special meeting had insufficient signatures of members in good standing and that it controlled three hundred and twenty-five votes which it received as a proxy from TIG Holdings on August 24, 2011. Several members then objected that TIG had not offered any proof that it had paid their dues. In fact, TIG had not paid any membership dues and of course, neither had LKM Group. McClung claimed that the only members in good standing at the September 2, 2011 meeting were himself and his family members since he was the only one who paid dues for 2011. However, the reason for that is due to the fact that Moy Toy never sent an invoice to any member to pay 2011 dues. The Court finds that there were eighty-six eligible votes present either in person or by proxy at the meeting of September 2,

24

> 2011, more than the ten percent quorum required of eligible members. Additionally, the TIG proxy of three hundred twenty-five votes were not authorized due to the fact that no dues had ever been paid by LKM Group; nor did LKM Group have developer rights to excuse its nonpayment of dues; nor did TIG make any application for membership as required for voting rights to attach to the new owners of these lots. As a result, Moy Toy only had three votes and even if Moy Toy had ten votes to every one of its lots, it would still only have thirty votes and would not control the HOA.
>
> *     *     *
>
> The minutes of the September 2, 2011 RMCC special meeting certify that there was a total of 115 potential members in good standing, and that 89 voting memberships were present (either in person or by proxy), or a quorum of seventy-seven percent present. The minutes of the meeting confirmed the vote removing the RMCC officers and directors by a vote of eighty-one to three, with four abstentions; the adoption of new bylaws by a vote of eighty-six to three; and the approval of three new directors for the RMCC.

(Footnotes and citation to record in original omitted). The court concluded that "the September 2, 2011 RMCC meeting was legitimate and that the actions approved at this meeting were legal."

On appeal, Defendants do not challenge any of the trial court's factual findings, which comprise the tale of the homeowners' long struggle to take care of their neighborhood property. Defendants only briefly argue that "the trial court's treatment of the election is inconsistent with the trial court's finding that there has been no valid developer [for the past 30 years] for the resort since developer rights were not transferred." This argument is neither particularly pertinent to the issue of the validity of the special election, nor is it persuasive. Again, the trial court's factual findings are driven in large part by its evaluation of the demeanor and credibility of the various witnesses. We affirm the trial court's ruling on this issue.

## F. Roads and Common Areas of Renegade Mountain

As the trial court found, "[s]ince 1972, Renegade Resort was a planned community which provided a golf course, swimming pool, tennis courts, sports park and a guard shack for many years." The trial court held that all RMCC members have an easement of enjoyment to use the roads, "both platted and unplatted," from Highway 70 to their property, and to use the "common properties . . . subject to the governing documents for Renegade Resort." In support of this conclusion, the court held and reasoned as follows:

25

Since Moy Toy purchased the property in 2010, it has not sold a single lot, undertaken any construction, and has failed to market the property in any significant way. In fact, from the very beginning, Moy Toy elected to allow the amenities to fall into disrepair and eliminate expenses for maintenance of roads, signs, security, lights, etc. Any reasonable amount of time for development by any purported developer has long since passed.

Numerous members and residents testified that they or other members used the common properties in question; were promised the common properties in question to purchase their property; relied on those promises; and paid dues which in the past were used to improve and maintain these common properties. Attorney Looney confirmed that RMCC members were allowed to use common properties; that he considered those properties in question to be common properties; and that he was unaware these common properties were not platted.

Considering the testimony and exhibits, the Court finds that the entrance area, guard shack, platted roads, certain unplatted roads, sports park, pool and tennis courts were all intended, promised, promoted, used, operated and maintained in the past as common property for the benefit of the developer and the RMCC members. Control of this unplatted land, which was intended and used as common properties in this community by the developer is not absolute, and the property remaining in the hands of a developer may be held in equity to be subject to these rights of enjoyment. *Innerimages,* [*Inc. v. Newman*, 579 S.W.3d 29, 45 (Tenn. Ct. App. 2019)]; *Land Developers, Inc. v. Maxwell*, 537 S.W. 2d 904, 912 (Tenn. 1976); *Stracener v. Bailey*, 737 S.W. 2d 536 (Tenn. Ct. App. 1987). While the common areas in Renegade Resort are not shown on plats, they are referenced in all versions of the restrictions, and lots were sold in reliance on these recorded equities. An easement of enjoyment is identified in every set of restrictions and in the 1987 bylaws for members of the RMCC who are in good standing. Here, Moy Toy effectively negated the RMCC's members['] easement of enjoyment by failing to maintain these common areas, thereby making them impossible to enjoy.

In making the above findings, the trial court has hit on each salient point explaining why it is equitable to enforce the easements of enjoyment of the common areas of Renegade Mountain held by the property owners who are in good standing. The recorded 1972 declaration of restrictive covenants expressly provides that "every member, so long as such membership shall continue, shall have a right and easement of enjoyment in and to the Common Properties and such easement shall be appurtenant to and shall pass with the title

to every Lot or Living Unit." The definition in the 1972 declaration of restrictive covenants provides that "Common Properties . . . shall specifically include, but not to the exclusion of other improvements which may hereinafter be designated as Common Properties by the Developer, the following: Roads and streets, golf course, tennis courts, swimming pools, permanent parks, and permanent recreational plots." As the trial court found, although "the common areas in Renegade Resort are not shown on plats, they are referenced in all versions of the restrictions."

The trial court heard from landowners and club members Norman Renaud, Joel Matchak, John Peters, Thomas Bauer, and John Moore, who testified that, as generally and accurately summarized by the trial court, "they or other members used the common properties in question; were promised the common properties in question to purchase their property; relied on those promises; and paid dues which in the past were used to improve and maintain these common properties." Mr. Matchak provided copies of roughly a decade's worth of budgets for RMCC showing that funds, provided by members' dues, were budgeted and spent on maintenance of the common areas such as the roads, pool, sports park, and guard shack entrance.

In *Innerimages, Inc. v. Newman*, 579 S.W.3d 29, 45 (Tenn. Ct. App. 2019), this Court considered "whether a developer who has failed to establish a homeowners association and provides only minimal services may continue to enforce restrictive covenants against residents in a common-interest community." We stated:

> "A property owner's right to own, use, and enjoy private property is a fundamental right." *Hughes v. New Life Dev. Corp.*, 387 S.W.3d 453, 474 (Tenn. 2012) (citations omitted). "Not surprisingly, then, Tennessee law does not favor restrictive covenants, because they are in derogation of the rights of free use and enjoyment of property." *Id.* at 474-75. Generally, restrictive covenants are only enforceable in equity if: (1) the restrictions "'touch and concern' the land"; (2) the original parties intended that the restrictions would "run with the land and bind remote grantees"; and (3) the remote grantees had notice of the restrictions. *Gambrell v. Nivens*, 275 S.W.3d 429, 437 (Tenn. Ct. App. 2008) (quoting *Tennsco Corp. v. Attea*, No. M2001-01378-COA-R3-CV, 2002 WL 1298808, at *2 (Tenn. Ct. App., filed June 13, 2002)).

> Here, the trial court determined that [the restrictive covenants], as initially drafted, were valid and therefore binding on remote grantees. We agree. The restrictions, which govern the use and appearance of property in The Village, certainly "touch and concern the land." The restrictions also expressly state the developer's intent that the restrictions "run with the title to said land[.]"

Finally, the developer presented proof that the restrictions were recorded and appear in the chain of title to each of the defendants' properties, thus putting the defendants on constructive notice.

*Id.* at 41. The *Innerimages* Court adopted and applied the Restatement (Third) of Property: Servitudes § 6.19(1)-(2) (Am. Law Inst. 2000), which provides that

> (1) The developer of a common-interest-community project has a duty to create an association to manage the common property and enforce the servitudes unless exempted by statute.
>
> (2) After the time reasonably necessary to protect its interests in completing and marketing the project, the developer has a duty to transfer the common property to the association, or the members, and to turn over control of the association to the members other than the developer[.]

*Id.* at 45 (emphasis in original omitted). We held that "developers have a duty (1) to create an association and (2) to turn over control to that association '[a]fter the time reasonably necessary to protect its interests in completing and marketing the project,'" observing in pertinent part as follows:

> The developer and the purchasers of property in a common-interest community have interests in controlling the common property and the association that may come into conflict. The developer's primary interest is in completing and selling the project, while that of the purchasers is in maintaining their property values and establishing the quality of life they expected when buying the property. Both the developer and the purchasers have substantial investment interests that are affected by the amount of assessments, the level of maintenance and capital improvements, and the establishment of reserves for future maintenance and replacement of common property. The developer needs to retain control of the association long enough to avoid changes that will jeopardize its ability to sell the remainder, while the purchasers need to stabilize assessments and take charge of the rules governing operation of the community. The longer the developer retains control, the greater the likelihood of conflict. Accordingly, modern common-interest-community statutes specify timetables within which the developer must turn over control to the members.

Comment (b) elaborates:

> In determining when control of a project reasonably must be turned over to the members, the percentage of lots or units that have been sold, the interval since the first unit was sold, and the level of the developer's construction and marketing activities are relevant. The Uniform Common Interest Ownership Act [UCIOA] provides a timetable for turnover of control based on these factors. In the absence of a controlling statute, a court may look for guidance to such a timetable in determining when the developer is required to cede control.

*     *     *

Thus, under the Restatement, developers have a *common law duty* to create an association and to turn over control "[a]fter the time reasonably necessary to protect its interests in completing and marketing the project[.]" Rest. (Third) of Property: Servitudes § 6.19(1)-(2). The Restatement recommends considering three factors in determining "the time reasonably necessary to protect [the developer's] interests": (1) "the percentage of lots or units that have been sold"; (2) "the interval since the first unit was sold"; and (3) "the level of the developer's construction and marketing activities." *Id*. at § 6.19 cmt. b. In states that have not adopted the UCIOA, such as Tennessee, the Restatement also recommends looking to the UCIOA as a barometer of reasonableness. *Id*.

*     *     *

The trial court also found that the developer had not constructed a new home since 2007. Under the UCIOA, a developer must cede control "two years after any right to add new units was last exercised." UCIOA § 1-103(d)(3). If that is any measure of reasonableness, then ten years without construction of a new home is patently unreasonable. . . .

The evidence in the record does not preponderate against the court's finding that the developer has only constructed four homes and provided minimal services in the twenty-four years since The Village's conception. Because the developer has failed to discharge its duty to create a homeowners association and to turn over control "[a]fter the time reasonably necessary to protect its interests in completing and marketing the project," we affirm the

29

judgment of the trial court to the extent that it prohibits the developer from exercising any further control over the defendants and their property.

*Id.* at 45-48.

In the present case, the trial court correctly applied the factors and principles espoused in *Innerimages* in holding that "all control, access, maintenance, and operation of these unplatted properties," defined by the court as "the entrance area, guard shack, platted roads, certain unplatted roads, sports park, pool and tennis courts,"[5] is "transferred to the RMCC" in order to secure and enforce the members' easement of enjoyment of these common properties. Defendants argue that *Innerimages* applies to developers, and that Moy Toy was determined not to be a "developer" here. This is true in the respect that the developer's rights at issue did not pass to Moy Toy. But Moy Toy's central position throughout the litigation, and its actions leading to the lawsuit, was that it *was* the developer. Moy Toy, as the owner, is still trying to maintain complete control over the areas designated and long-used as "common properties" on Renegade Mountain. Although there are some differences in the factual scenarios of this case and *Innerimages*, they are similar in that they both involve a developer (or a party claiming to be and acting as one), who desires to maintain perpetual power and control over the development, without shouldering the responsibility and expense of maintaining its common areas, at a time when any actual "development" of the residential community has long passed.

As a final matter, Plaintiffs raise an issue of relatively uncomplicated semantics regarding the property where the golf course was. Both sides agree that the trial court's post-trial order incorrectly stated that the golf course was included as common property. The old golf course property is owned by an entity that was apparently never a party to this action. The parties stipulated that "the golf course is not an issue" at the trial. In response to both sides' motion to alter or amend, the trial court issued an order stating "that both parties agreed that the golf course property was stipulated not to be considered a common property" and finding that "Plaintiffs have no interest in the former golf course property." On appeal, Plaintiffs argue that this language is overbroad, imprecise, and incorrect. They express concern that it might conceivably be used against them in a future dispute. The transcript indicates that the stipulation was that the golf course property was "not an issue" before the court, not that the property was not considered as common property. It appears that the parties agreed before the trial court that it was being asked to make no determination whatsoever regarding the old golf course property because it was "not an issue."

---

[5] Plaintiffs point out on appeal that this definition of "common properties" in the trial court's order is somewhat different from the language used in the trial court's order disposing of the issues raised in the parties' motion to alter or amend the judgment. To the extent that the definitions are inconsistent, we hold that the trial court's more expansive definition, quoted above, is the correct one.

## V. CONCLUSION

We vacate the trial court's findings that the parties stipulated that the old golf course property was not to be considered "common property," and that Plaintiffs "have no interest" in it. We affirm the trial court's judgment in all other respects. Costs on appeal are assessed to the appellants, Michael McClung, Phillip Guettler, Darren Guettler, and Moy Toy, LLC, for which execution may issue if necessary.

_____
KRISTI M. DAVIS, JUDGE